Drexel A. Bradshaw (SBN 209584)
Joseph L. Urbanski (SBN 246543)
Ariana E. Downing (SBN 261865)
Bradshaw & Associates, P.C.
44 Montgomery Street
Thirty-eighth Floor
San Francisco, California  94104
Telephone:       (415) 433-4800
Facsimile:       (415) 433-4841

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| Angela Anthony, John Anthony, Joseph Adams, Nick Adams, Patrick Becler, Mark Boswell, Mark Boswell Jr., Tommy Boswell, Melissa Catron, Richard De La Vega, Donald Durbin, Horace Durbin, Teresa, Don Francis, Tina M. Frederickson, Jessica Graham, David Hardy, Ronda Hughes, Jerry Jones, Sandra S. Jones, Monique Karki, John Macdonald, Scott R. Martin, Dale Melvin, Stefany Millward, Susan Murchison, Robert Rosas, Jack L. Smith, Rebecca Smith, Tory Stepp, Travis Spinale, Jamie Wahl,  Nita Webster, and Sean W. Wood Jr., <br><br> Plaintiffs, <br><br> v. <br><br> Jonothan Benefield, Julie Benefield, Walnut Hill Estate Enterprises, LLC, and DOES 1through100, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND CONSTRUCTIVE TRUST FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1961, et seq.); MAIL FRAUD (18 U.S.C. § 1341); WIRE FRAUD (18 U.S.C. § 1343); CIVIL FORFEITURE (18 U.S.C. § 981); FAIR LABOR STANDARDS ACT (29 U.S.C. § 201 *et seq.*); CALIFORNIA CIVIL CODE §§ 44 *et seq.*, 51 *et seq.*, 1565, 1572, 1950.5, 1941, 1941.1, 1942.5, 3300, 3336, 3479, 3480, 3481; CALIFORNIA LABOR CODE §§ 201, 202, 203, 1197, 1198; CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 *et seq.*; BREACH OF THE COVENANT OF QUIET ENJOYMENT; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; CONSTRUCTIVE EVICTION; WRONGFUL EVICTION, WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; AND NEGLIGENCE** <br><br> **DEMAND FOR JURY TRIAL** |

- 1 -

## JURISDICTION AND VENUE

1. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331. This case arises under the laws of the United States, and it presents a federal question within this Court's jurisdiction for violations of 18 U.S.C. §§ 981, 1341, 1343, 1961, 1962, 1964, 1965, and 29 U.S.C. § 201 *et seq.*

2. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy.

3. This Court has personal jurisdiction over Defendants under California Code of Civil Procedure § 410.10 because Defendants do business in the State of California or otherwise have minimum contacts with the State of California justifying this Court's jurisdiction.

4. This Court has personal jurisdiction over Plaintiffs under California Code of Civil Procedure § 410.10 because Plaintiffs reside in Butte County, in the State of California, and have so resided at all times relevant to this action.

5. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2) because the unlawful conduct that gave rise to these claims occurred in and around the property located at 2066 Bird Street, Oroville, California. The property located at 2066 Bird Street, Oroville, California, is located within the Eastern District of California.

## INTRADISTRICT ASSIGNMENT

6. Pursuant to Gen. L.R. 3-120(d), this action arises out of Butte County, in the Eastern District of California. A substantial amount of the events, which gave rise to the claims set forth herein, occurred in Butte County. In addition, the property at issue is situated in Butte County.

## PARTIES

7. Plaintiff Joseph Adams ("Mr. Adams") is a natural person over the age of 18 years and is a citizen of California. Mr. Adams is and was a resident of Butte County at all times relevant to this complaint. Mr. Adams resides at 2066 Bird Street, apartment 106, in Oroville, California.

8. Plaintiff Nick Adams is a natural person over the age of 18 years and is a citizen of California. Mr. Nick Adams is and was a resident of Butte County at all times relevant to this complaint. Mr. Nick Adams resides at 2066 Bird Street, apartment 106, in Oroville, California.

9. Plaintiff John Anthony ("Mr. Anthony") is a natural person over the age of 18 years and is a

citizen of California.  Mr. Anthony is and was a resident of Butte County at all times relevant to this complaint.  Mr. Anthony resides at 2066 Bird Street, apartment 323, in Oroville, California.

10. Plaintiff Angela Anthony ("Mrs. Anthony") is a natural person over the age of 18 years and is a citizen of California.  Mrs. Anthony is and was a resident of Butte County at all times relevant to this complaint.  Mrs. Anthony used to reside at 2066 Bird Street, apartment 323, Oroville California; she currently resides at the Regal Inn in Chico, California.

11. Plaintiff Patrick Becler ("Mr. Becler") is a natural person over the age of 18 years and is a citizen of California.  Mr. Becler is and was a resident of Butte County at all times relevant to this complaint.  Mr. Becler resides at 2066 Bird Street, apartment 309, in Oroville, California.

12. Plaintiff Mark Boswell ("Mr. Boswell") is a natural person over the age of 18 years and is a citizen of California.  Mr. Mark Boswell is and was a resident of Butte County at all times relevant to this complaint.  Mr. Boswell resides at 2066 Bird Street, apartment 203, in Oroville, California

13. Plaintiff Mark Boswell Jr. is a natural person over the age of 18 years and is a citizen of California.  Mark Boswell Jr. is and was a resident of Butte County at all times relevant to this complaint.  Mark Boswell Jr. resides at 2066 Bird Street, apartment 203, in Oroville, California.

14. Plaintiff Tommy Boswell is a natural person over the age of 18 years and is a citizen of California.  Tommy Boswell is and was a resident of Butte County at all times relevant to this complaint.  Tommy Boswell resides at 2066 Bird Street, apartment 203, in Oroville, California.

15. Plaintiff Melissa Catron ("Ms. Catron") is a natural person over the age of 18 years and is a citizen of California.  Ms. Catron is and was a resident of Butte County at all times relevant to this complaint.  Ms. Catron resides at 2066 Bird Street, apartment 103, in Oroville, California.

16. Plaintiff Richard De La Vega ("Mr. De La Vega") is a natural person over the age of 18 years and is a citizen of California.  Mr. De La Vega is and was a resident of Butte County at all times relevant to this complaint.  Mr. De La Vega resides at 2066 Bird Street, apartment 316, in Oroville, California.

17. Plaintiff Donald Durbin ("Mr. Durbin") is a natural person over the age of 18 years and is a citizen of California.  Mr. Durbin is and was a resident of Butte County at all times relevant to this complaint.  Mr. Durbin resides at 2066 Bird Street, apartment 103, in Oroville, California.

18. Plaintiff Horace Durbin is a natural person over the age of 18 years and is a citizen of California.

Horace Durbin is and was a resident of Butte County at all times relevant to this complaint. Horace Durbin resides at 2066 Bird Street, apartment 211, in Oroville, California.

19. Plaintiff Teresa Durbin ("Ms. Durbin") is a natural person over the age of 18 years and is a citizen of California. Teresa Durbin is and was a resident of Butte County at all times relevant to this complaint. Ms. Durbin resides at 2066 Bird Street, apartment 211, in Oroville, California.

20. Plaintiff Don Francis ("Mr. Francis") is a natural person over the age of 18 years and is a citizen of California. Mr. Francis is and was a resident of Butte County at all times relevant to this complaint. Mr. Francis resides at 2066 Bird Street, apartment 321, in Oroville, California.

21. Plaintiff Tina M. Frederickson ("Ms. Frederickson") is a natural person over the age of 18 years and is a citizen of California. Ms. Frederickson is and was a resident of Butte County at all times relevant to this complaint. Ms. Frederickson resides at 2066 Bird Street, apartment 408, in Oroville, California.

22. Plaintiff Jessica Graham ("Ms. Graham") is a natural person over the age of 18 years and is a citizen of California. Ms. Graham is and was a resident of Butte County at all times relevant to this complaint. Ms. Graham resides at 2066 Bird Street, apartment 305, in Oroville, California.

23. Plaintiff David Hardy ("Mr. Hardy") is a natural person and is a citizen of California. Mr. Hardy is and was a resident of Butte County at all times relevant to this complaint. Mr. Hardy used to reside at 2066 Bird Street, Oroville, California; Mr. Bird is currently homeless, living in and around the City of Oroville, California.

24. Plaintiff Ronda Hughes ("Ms. Hughes") is a natural person over the age of 18 years and is a citizen of California. Ms. Hughes is and was a resident of Butte County at all times relevant to this complaint. Ms. Hughes resides at 2066 Bird Street, apartment 306, in Oroville, California.

25. Plaintiff Jerry Jones ("Mr. Jones") is a natural person over the age of 18 years and is a citizen of California. Mr. Jones is and was a resident of Butte County at all times relevant to this complaint. Mr. Jones lived at 2066 Bird Street, Apartment 106, Oroville, California for many months in 2009 and 2010; Mr. Jones currently lives at 5170 Feather River Boulevard, Olivehurst, California.

26. Plaintiff Sandra S. Jones ("Mrs. Jones") is a natural person over the age of 18 years and is a citizen of California. Mrs. Jones is and was a resident of Butte County at all times relevant to this complaint. Mrs. Jones lived at 2066 Bird Street, Apartment 106, Oroville, California for many

- 4 -

1   months in 2009 and 2010; Mrs. Jones currently lives at 5170 Feather River Boulevard, Olivehurst,

2   California.

3   27. Plaintiff Monique Karki ("Ms. Karki") is a natural person over the age of 18 years and is a citizen

4   of California.   Ms. Karki is and was a resident of Butte County at all times relevant to this

5   complaint. Ms. Karki lives at 2066 Bird Street, apartment 312, in Oroville, California.

6   28. Plaintiff John Macdonald ("Mr. Macdonald") is a natural person over the age of 18 years and is a

7   citizen of California.  Mr. MacDonald is and was a resident of Butte County at all times relevant to

8   this complaint. Mr. Macdonald resides at 2066 Bird Street, apartment 403, in Oroville, California.

9   29. Plaintiff Scott R. Martin ("Mr. Martin") is a natural person over the age of 18 years and is a citizen

10  of California.  Mr. Martin is and was a resident of Butte County at all times relevant to this

11  complaint. Mr. Martin resides at 2066 Bird Street, apartment 401, in Oroville, California.

12  30. Plaintiff Dale Melvin ("Mr. Melvin") is a natural person over the age of 18 years and is a citizen of

13  California.   Mr. Melvin is and was a resident of Butte County at all times relevant to this

14  complaint. Mr. Melvin resides at 2066 Bird Street, apartment 201, in Oroville, California.

15  31. Plaintiff Stefany Millward ("Ms. Millward") is a natural person over the age of 18 years and is a

16  citizen of California. Ms. Millward is and was a resident of Butte County at all times relevant to

17  this complaint. Ms. Millward resides at 2066 Bird Street, apartment 221, in Oroville, California.

18  32. Plaintiff Susan Murchison ("Ms. Murchison") is a natural person over the age of 18 years and is a

19  citizen of California. Ms. Murchison is and was a resident of Butte County at all times relevant to

20  this complaint. Ms. Murchison resides at 2066 Bird Street, apartment 404, in Oroville, California.

21  33. Plaintiff Robert Rosas ("Mr. Rosas") is a natural person over the age of 18 years and is a citizen of

22  California. Mr. Rosas is and was a resident of Butte County at all times relevant to this complaint.

23  Mr. Rosas resides at 2066 Bird Street, apartment 319, in Oroville, California.

24  34. Plaintiff Jack L. Smith ("Mr. Smith") is a natural person over the age of 18 years and is a citizen of

25  California.  Mr. Smith is and was is and was a resident of Butte County at all times relevant to this

26  complaint. Mr. Smith resides at 2066 Bird Street, apartment 317, in Oroville, California.

27  35. Plaintiff Rebecca Smith ("Ms. Smith") is a natural person over the age of 18 years and is a citizen

28  of California.   Ms. Smith is and was a resident of Butte County at all times relevant to this

complaint. Ms. Smith resides at 2066 Bird Street, apartment 305, in Oroville, California.

36. Plaintiff Travis Spinale ("Mr. Spinale") is a natural person over the age of 18 years and is a citizen of California.  Mr. Smith is and was a resident of Butte County at all times relevant to this complaint.  Mr. Spinale resides at 2066 Bird Street, apartment 407, in Oroville, California.

37. Plaintiff Tory Stepp ("Ms. Stepp") is a natural person over the age of 18 years and is a citizen of California.  Ms. Stepp is and was a resident of Butte County at all times relevant to this complaint.  Ms. Stepp resides at 2066 Bird Street, apartment 309, in Oroville, California.

38. Plaintiff Jamie Wahl ("Ms. Wahl") is a natural person over the age of 18 years and is a citizen of California.  Ms. Wahl is and was a resident of Butte County at all times relevant to this complaint.  Ms. Wahl resides at 2066 Bird Street, apartment 223, in Oroville, California.

39. Plaintiff Nita Webster ("Ms. Webster") is a natural person over the age of 18 years and is a citizen of California.  Ms. Webster is and was a resident of Butte County at all times relevant to this complaint.  Ms. Webster resides at 2066 Bird Street, apartment 409, in Oroville, California.

40. Plaintiff Sean W. Wood Jr. ("Mr. Wood") is a natural person over the age of 18 years and is a citizen of California.  Mr. Wood is and was a resident of Butte County at all times relevant to this complaint.  Mr. Wood resides at 2066 Bird Street, apartment 304, in Oroville, California.

41. The Plaintiffs are informed and believe that Defendant Walnut Hill Estate Enterprises LLC ("Walnut Hill Estate") is a real estate corporation incorporated under the laws of the State of California with its principal place of business in California. Upon information and belief, Defendant Walnut Hill Estate is in the business of purchasing properties as investments, and therein acting as landlord. Upon information and belief, Plaintiff alleges that Defendant Walnut Hill Estate is the owner and landlord of the property located at 2066 Bird Street, Oroville, California.

42. The property located at 2066 Bird Street, Oroville, California, is located within Butte County in the State of California.

43. Upon information and belief, Defendants Jonothan Benefield and Julie Benefield, at all times relevant herein, actually owned, dominated, and controlled Walnut Hill Estate Enterprises LLC, and orchestrated, ratified and were otherwise involved in the unlawful schemes hereinafter described.

44. The Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein under

the fictitious names Doe One through Doe One-Hundred, inclusive.  The Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  The Plaintiffs are informed and believe that each of the Doe Defendants is responsible in some manner for the occurrences and injuries alleged in this complaint.

45. Upon information and belief, Defendants are responsible for the occurrences herein alleged, and that Plaintiffs' injuries as herein alleged were proximately caused by the acts or omissions by the Defendants.

## FACTUAL ALLEGATIONS

46. The building located at 2066 Bird Street, Oroville, California, is five stories tall and is commonly known as the Oroville Inn.

47. The Oroville Inn is an apartment complex owned and managed by Defendant Walnut Hill Estate Enterprises.   Defendants Jonothan Benefield and Julie Benefield own, operate and control Defendant Walnut Hill Estate Enterprises; Defendants have employed Kelly Wilkerson, Jerry Jones, and many other persons as resident property managers at the Oroville Inn.

48. Each Plaintiff resided or still resides at the Oroville Inn.

**Oroville City Counsel Investigation of Building Code Violations at 2066 Bird Street**

49. On or about January 2, 2009, Ms. Kelly Wilkerson, the property manager at 2066 Bird Street and agent of Defendants, refused to allow persons sent by the City of Oroville ("the City") to inspect the premises of the Oroville Inn.

50. The Oroville City Attorney obtained a warrant, and a building inspection was conducted later in January 2009.  The inspector observed several hundred building code violations.

51. The City determined that the living conditions at the Oroville Inn were substandard, and on April 22, 2009, the City gave Defendants written notice to either repair all of the housing code violations or demolish the building within 60 days.

52. Additional compliance inspections were conducted in July and September 2009, and 602 substandard housing conditions were found remaining on the property. A report detailing these substandard housing conditions is attached as **Exhibit A**, and incorporated herein by reference.

53. On October 2 and 7, 2009, the City sent Defendants two more notices to abate the substandard housing conditions of the Oroville Inn.

54. On October 14, 2009, The Oroville City Council held a hearing to consider adopting a resolution declaring that the substandard housing conditions of the Oroville Inn were a public nuisance and ordering abatement of the nuisance.

55. Defendant Jonothan Benefield appeared at the hearing, represented by Frear Stephen Schmid.

56. After the hearing concluded, the Oroville City Council found that the substandard housing conditions were so extensive and of such a nature that they posed a substantial danger to the health and safety of human occupants, including, but not limited to, carbon monoxide poisoning, electrocution, exposure to disease, and exposure to injury from water intrusion and material or structural failures.

57. The Council also found that unless these conditions were abated, they would cause injury or death from fire, fire-related hazards, or other similar and related health and safety hazards.

58. On November 23, 2009, the Oroville City Council, through Resolution No. 7458, ordered Defendants to abate all 602 substandard housing conditions discovered during inspection within 60 days.

**Joseph Adams, Nick Adams, and Jamie Wahl**

59. Plaintiff Joseph Adams and his wife, Jamie Wahl, signed a lease to rent a one-bedroom apartment at the Oroville Inn in September 2009. Mr. Adams, Ms. Wahl and their son, Nick Adams, moved into unit 223 in September 2009.

60. Mr. Adams pays $550 a month in rent. Mr. Adams also paid $750 as security deposit. Mr. Jerry Jones, building manager and agent of Defendants, orally informed Mr. Adams that their security deposit was $200 more than normal because the Adams' had poor credit.

61. Mr. Adams entered into an agreement with Jonothan Benefield whereby Mr. Adams and his son would perform general repair and janitor services for the Oroville Inn in lieu of paying rent. Mr. Benefield orally agreed to compensate Mr. Adams and his son $200 per room to clean and repair the room.

62. However, Mr. Adams and his son completed more than $550 worth of work on the Oroville Inn, and they performed work that contractors or persons with licenses should be doing, such as elevator repair. As a result, Mr. Adams requested higher compensation from Mr. Benefield. Mr. Benefield orally agreed to pay Mr. Adams an additional $200 every two weeks for the work of

both Mr. Adams and his son.

63. Mr. Benefield called Mr. Adams every day to make sure that Mr. Adams and his son were working on the Inn.

64. Mr. Adams kept records of the hours he and his son worked for Mr. Benefield. Mr. Adams and his son each worked between 11 and 17 hours per day cleaning and repairing the Oroville Inn. They worked six or seven days per week.

65. Based on the number of hours that Mr. Adams and his son worked, Mr. Benefield compensated Mr. Adams and his son for their work at a rate well below minimum wage. Mr. Benefield would have to pay Mr. Adams and his son thousands of dollars in order to compensate Mr. Adams and his son at minimum wage for all the work they performed on the Oroville Inn.

66. Mr. Adams repaired what he was told to repair. Some of the tasks Mr. Adams performed at the Inn included removing dead animals from between walls, removing dead pigeons from the hot water tank, repairing the elevator, repairing and replacing water-damaged and moldy drywall, and repairing leaky plumbing.

67. The Adams' apartment is substandard and untenantable.

68. Water leaks through the ceiling in the Adams' bathroom every time the tenant in the unit above him flushes the toilet. Mr. Adams has attempted and failed to repair this leak.

69. The Adams' apartment is infested with cockroaches and mice. Management sprayed pesticides several times to kill the cockroaches.

70. The Adams tried to keep out the mice, but they have been unsuccessful. Mice feces appear in their cabinets and drawers. The management has made no effort to abate the mouse problem.

71. The Adams had to purchase their own refrigerator because the one that came with the unit was full of cockroaches and it barely worked.

72. On one occasion, Ms. Wahl turned on the hot burner (stove) in her apartment and it shot out flames, causing her severe distress and nearly causing severe injury.

73. Ms. Wahl must constantly clean her apartment with bleach in order to keep the mold at bay.

74. The Adams have a five year old child who lives with them, and the Adams worry that the mold and other unsafe conditions will affect their child's health.

75. The windows of the Adams' apartment are not properly weather sealed, and water leaks in every

time it rains.

76. The Adams paid for extensive repairs on their apartment.   Mr. Adams put in new floors and cabinets.

77. During their tenancy, the Adams noticed that several other rooms in the Inn are completely uninhabitable, and the locks on those rooms do not work.   One of the rooms near the Adams' apartment is covered in pigeon feces.

**John Anthony and Angela Anthony**

78. Plaintiffs John Anthony ("Mr. Anthony") and Angela Anthony ("Mrs. Anthony") are married.

79. Mr. Anthony signed a lease renting a one-bedroom apartment at the Oroville Inn for $525 per month. Mrs. Anthony did not sign the lease because Mr. Jones told her that she did not need to.

80. The Anthonys moved into unit 323 of the Oroville Inn in November 2009.   This unit is substandard and untenantable.

81. Immediately inside the front door, there is a large hole in the ceiling resulting from an incessant leak.  Mold grows on the remaining ceiling drywall around the hole, and mold and mildew grow in the carpet directly below the leak.

82. The ceiling leaks in the bedroom as well.  The ceiling and walls are stained from the water.

83. The Anthonys' apartment is infested with cockroaches.  Mr. Jones knew and orally informed the Anthonys about the cockroaches when they moved in, but the management has never taken any measures to abate the infestation in the Anthonys' apartment.

84. The refrigerator in the apartment did not work when the Anthonys moved in.  The temperature inside the refrigeration did not remain cool enough, and the Anthonys' food spoiled on several occasions.

85. The Anthonys told Mr. Jones about the broken refrigerator immediately upon discovering it.  A month went by before Mr. Jones was able to provide a replacement refrigerator.

86. The temperature knob for one of the burners on the Anthonys' stove is broken.  When turned on, the burner does not become warm.  Instead, it emits smoke, causing a dangerous fire hazard.

87. The Anthonys informed the management of this problem.  Mr. Jones attempted to repair the burner but he was unable to.  To date, the burner still does not work.

88. The plumbing to the Anthonys' toilet leaks, requiring the Anthonys to turn the water off at the

plumbing valve every time the toilet is used to prevent the toilet from overflowing.

89. A substance that the Anthonys believe is either mold or mildew covers the wall and floor around the toilet. The substance emits a musty smell. The Anthonys tried to clean the area, but they cannot use bleach because Mrs. Anthony is allergic to bleach.

90. The fire alarm did not work when the Anthonys moved into the apartment. It was only after the most recent inspection of the building that the management repaired the fire alarm. However, the fire alarm now malfunctions, as it goes off without provocation on occasion.

91. Mr. Anthony made many requests to management at the Inn to repair the substandard conditions in his apartment throughout the duration of his tenancy. The managers often told the Anthonys that Mr. Benefield would not provide the money to make the repairs.

92. The Anthonys suffered emotional distress from living in the substandard conditions of the Oroville Inn. They suffered grief and anguish, and they worry that that they may have contracted an illness from exposure to the unsafe, unsanitary, and substandard conditions of the Inn.

93. On or about January 17, 2010, Mrs. Anthony went to the Del Norte Family Health Center at 2800 Lincoln Street in Oroville because she was feeling ill. The Doctor advised Mrs. Anthony that she had contracted a bronchial infection and that she would have developed pneumonia had she waited longer before seeking medical attention. Mrs. Anthony was still residing at the Oroville Inn at the time. The Doctor advised Mrs. Anthony that she should move out of the Oroville Inn as soon as possible because the mold may have caused or may exacerbate her illness.

94. The Doctor also informed Mrs. Anthony that she suffered from a stroke in the week prior to her visit. On information and belief, the stroke was also caused by Mrs. Anthony's exposure to mold and other substandard living conditions at the Oroville Inn.

95. Mrs. Anthony moved out of the Oroville Inn on about January 20, 2010. She currently lives at the Regal Inn in Chico, California.

96. Mrs. Anthony's health has progressively improved since she moved out of the Oroville Inn.

97. Mr. Anthony's health has also been affected by his residency at the Oroville Inn. About a month after he moved in, he noticed that his breathing was more difficult, his lungs felt tight, and he was constantly congested. Mr. Anthony also developed a severe cough. Mr. Anthony's cough and difficulty breathing has progressively worsened.

98. Mr. Anthony intends to move out of the Oroville Inn because he believes that the substandard and untenantable conditions there have made him ill.

**Patrick Becler**

99. Plaintiff Patrick Becler moved into the Oroville Inn on or about 2006 or 2007.  Mr. Becler pays $525.00 per month for a one bedroom apartment, and he rents this apartment on a month-to-month basis.  Mr. Becler remembers paying a deposit, and he believes the amount was $525.

100.    Mr. Becler first moved into unit 221 of the Oroville Inn, but now Mr. Becler lives in unit 309. Mr. Becler moved out of unit 221 because there was a leak in the ceiling, mold, mice and cockroaches.  Mr. Becler requested that the management of the Oroville Inn repair the leak and mold on his ceiling and his mice problem.

101.    The leak continued unabated for three to four months, and mold and fungus began growing around the leak.

102.    Instead of repairing the leak, the management moved Mr. Becler into unit 309.  Mr. Becler still suffers from mice in his current unit.

103.    Mr. Becler has noticed mold growing in the hallways of the Oroville Inn.   He has noticed cockroaches in the lobby.  Also, when it rains, pools of water accumulate in the lobby because the roof and windows leak.

**Mark Boswell, Mark Boswell Jr., and Tommy Boswell**

104.    Plaintiff Mark Boswell moved into the Oroville Inn with his two sons, Tommy and Mark Jr., on or about January 2003.  At the time, the Boswells paid $425 per month to rent Apartment 203. The Boswells also paid $425 in security deposit.  The Boswells currently pay $450.00 per month for their apartment.

105.    A large patch of mold, over two feet in diameter, grows on the wall over Mark Boswell Jr.'s bed.  Mr. Boswell has tried to bleach the mold away, but it grows back after a couple of weeks.

106.    The ceiling above Mark Boswell Jr.'s bed is falling down.  Paint and plaster chips constantly fall on his bed.  Both the mold and the ceiling failure are the result of a leak.

107.    The unit above the Boswells' unit is condemned.  There is a notice on the door that no one is allowed to enter, but there is no lock on the door and persons often enter the condemned unit.

108.    Every time someone uses the bathroom in the condemned unit, water leaks into the Boswells'

bathroom.  Mark Boswell Sr. eventually had to go up to the condemned unit and figure out how to shut off the water to the bathroom.

109.    The Boswells requested that these leaks be repaired several times during the first few years they lived in the apartment.  The managers promised "to get to it."  After years of empty promises, the Boswells eventually accepted the futility of their requests and stopped making the effort.

110.    The sink in the Boswells' bathroom has not had running water for the past four years.  The Boswells requested that this problem be repaired, but their request went unheeded.

111.    There is mold in the Boswells' bathroom, and the plastic shower stall is peeling away from the wall.  For the past three years, the management has promised the Boswells that they had the parts to repair the shower and that they would repair the shower.  However, the shower has not been repaired.

112.    Mark Boswell Sr. has confronted Mr. Benefield and the property managers about the poor conditions of his apartment.  Mr. Benefield always blames the managers.  The managers always blame Mr. Benefield for not giving them enough money to make necessary repairs.

113.    Four and a half years ago, an inspector required the Oroville Inn to make necessary repairs. The tenants were put in a hotel while repairs were made on the Inn.  Mr. Boswell thinks that the current condition is worse than when repairs were ordered four and a half years ago.

114.    Right before the Boswells were placed in the hotel, Mr. Benefield personally guaranteed Mark Boswell Sr. that his bathroom would be repaired.  The bathroom was never repaired, and Mr. Benefield later denied that he promised to repair the bathroom.

115.    All these years, the hallway carpet outside of the Boswells' apartment has not been cleaned.  In this time, people have urinated on the carpet and wiped human waste on the walls.

**Melissa Catron and Donald Durbin**

116.    Plaintiffs Melissa Catron and Donald Durbin signed a lease and moved into the Oroville Inn on or about September 21, 2009.  Ms. Catron and Mr. Durbin pay $550.00 per month to rent unit 103, a one bedroom apartment.  Ms. Catron and Mr. Durbin also paid a $550 security deposit.

117.    In Ms. Catron's and Mr. Durbin's apartment the toilet leaks, the sewage pipe leaks, and the toilet is off-balance.  There is always some water on the floor of the bathroom because the toilet leaks.

118.   The windows do not shut properly and water leaks in when it rains.  Water also leaks from the air conditioning unit.  Mold grows on the walls near the air conditioning units.  Ms. Catron sprays the mold with bleach, but it just grows back.

119.   Ms. Catron is bipolar and has been declared disabled by the Social Security Administration.  The Benefields are aware of Ms. Catron's condition.

120.   Mr. Durbin entered an oral agreement with the management to work instead of paying rent.  Mr. Benefield agreed to compensate Mr. Durbin at a rate of $8.50 per hour.  Mr. Jones kept a time sheet recording all of the hours that Mr. Durbin worked.  However, Mr. Durbin was never paid for the hours he worked.  Once he had worked enough to pay off one month's worth of rent, he was told that any additional hours he worked would be deducted from the following month's rent.

121.   Mr. Durbin repaired and replaced many things at the Oroville Inn, and he often worked with mold without using a respirator.  Mr. Durbin cleaned dead pigeons out of vacant rooms without using a respirator.   The management required Mr. Durbin to repair electrical wiring and appliances.

122.   Since Mr. Durbin began living at the Oroville Inn, he has observed blood in his feces.  Mr. Durbin is worried that this is a result of his exposure to mold.  Mr. Durbin has not visited a doctor yet because he does not have the money to pay for the visit.

**Richard De La Vega**

123.   Plaintiff Richard De La Vega moved into the Oroville Inn in the 1990s.  He has lived in four different one-bedroom units in the building during that time: unit 325, 211, 105, and 316.  Mr. De La Vega paid $375 per month in rent when he first moved in; his rent is currently $425 a month.  Mr. De La Vega paid an amount equal to his monthly rent as his security deposit when he moved in.

124.   The ceiling of Mr. De La Vega's most recent apartment had water bubbles.  At first they were small, but they increased in size as more rain came.  They leaked.  Eventually, maintenance repaired the bubbles.

125.   Mr. De La Vega has lived with a cockroach infestation in his apartment at the Oroville Inn.

126.   When it is windy and rainy, Mr. De La Vega's windows leak some water.

127.   Mr. De La Vega has been suffering from a large amount of stress since the middle of February

2010.  The stress has caused him to vomit on several occasions.  Mr. De La Vega is worried about the move and he is anxious about the conditions of the building affecting his health in the event of a fire or an earthquake.  Mr. De La Vega reports that a lot of the windows are locked, and he worries that he would be unable to escape from the building in the event of a fire or earthquake.

**Horace and Teresa Durbin**

128.    Plaintiff Horace Durbin moved into the Oroville Inn on or about July 2009 with Teresa Durbin.  The Durbins pay $425.00 per month to rent unit 211, a studio apartment.  They also paid $425 as a security deposit.

129.    The heater in the Durbins' apartment does not work.  They requested that the management repair the heater, but the management did not repair the heater.  As a result, the Durbins were forced to purchase a space heater.  When the Durbins run their space heater, they cannot plug in any other objects or the fuse will blow.

130.    The Durbins' apartment is infested with mice.  They informed Mr. Jones of the problem.  Mr. Jones expressed that he did not have supplies to abate the infestation because the Benefields only allot a few hundred dollars each month for repairs.

131.    The bathroom door is falling off of its hinges, and the Durbins are disabled and cannot repair the door themselves.  They have made several repair requests, but the door has yet to be repaired.

132.    There are mold mushrooms growing in the hallway near the Durbins' apartment. The building smells musky, like mold.

133.    Mr. Durbin suffers from schizophrenia, and he struggles to have conversations.  Mr. Durbin uses a power wheelchair to get around.

134.    Mrs. Durbin suffers from Crohn's disease and has a colostomy bag.  She is confined to bed most of the time.  Both Durbins are under a lot of stress because they do not have the money to move out of the apartment, even though it is deplorable.

**Don Francis**

135.    Plaintiff Don Francis signed a three-month lease to rent unit 321 in the Oroville Inn on or about March 11, 2004.  Mr. Francis paid $450 as a security deposit, and he paid $450 per month in rent.  Currently, he pays $475.00 per month in rent.

136.    The stove in Mr. Francis's apartment has faulty wiring, so only one of the burners works.

137.   The ceiling in Mr. Francis's shower stall is caving in.

138.   Mr. Francis has made repair requests to the managers, who have told him that they are unable to repair his apartment because the owner has not provided enough money to repair everything. Because Mr. Francis believes it is futile to ask the management to repair his apartment, he has begun making simple repairs on it himself.

139.   Mr. Francis wishes to move out of the Oroville Inn because of its deplorable condition, but his only source of income is Social Security Insurance and he cannot afford to move somewhere else. Mr. Francis is fearful that Mr. Benefield will not return his security deposit.

**Tina M. Frederickson**

140.   Plaintiff Tina M. Frederickson signed a lease to rent an apartment at the Oroville Inn.  Ms. Frederickson moved into the Inn on or about April 1, 2009. This was the second time Ms. Frederickson lived in the Inn. Her first tenancy began about 1994 and ended around 2007.

141.   Ms. Frederickson was told that the deposit to move into the Inn would be $400. Ms. Frederickson's sponsor, Cathy, paid Ms. Frederickson's deposit. However, when Cathy paid the deposit, Cathy was told the deposit was $450, not $400. Cathy paid the extra $50 a few days later.

142.   When Ms. Frederickson moved into unit 408 at the Oroville Inn, the carpet had not been cleaned.

143.   The windows to Ms. Frederickson's apartment are not properly sealed and water seeps in.  The windows are also located directly above Ms. Frederickson's heater.  During the last storm, Ms. Frederickson had to shut off her heater because water from the rain was seeping down into the heater and she was worried that she would be electrocuted.  She could not turn the heater back on again until there was no more water in her heater.

144.   Ms. Frederickson takes the elevator to get to her unit.  The elevator is filthy, and once she got stuck in the elevator.

145.   Ms. Frederickson's bathroom ceiling leaks and her toilet rocks back and forth.  Some of her faucets leak.

146.   Ms. Frederickson has made several requests for repairs in her apartment.  However, most of Ms. Frederickson's problems with her apartment have not been repaired.

147.   Cockroaches infest Ms. Frederickson's apartment.  Pigeons get trapped in the Inn.  They leave

- 16 -

1   feces in the interior of the Inn and it smells terrible.

2   **David Hardy**

3   148.   Plaintiff David Hardy signed a written lease renting a studio apartment at the Oroville Inn on

4   or about February or March 2009.  The stated monthly rent for the unit was $425, and Mr. Hardy

5   and an agent of the Defendants signed a written agreement whereby Mr. Hardy would work for the

6   Oroville Inn to pay off his rent.

7   149.   Mr. Hardy agreed in writing to perform general maintenance work for 53 hours a month at

8   wages of $8.00 per hour, and this information was entered into his lease.  The days and times Mr.

9   Hardy was expected to work were not agreed upon.

10   150.   The management often requested that Mr. Hardy work more than 53 hours per month, but he

11   never did so because he believed that Defendant Jonothan Benefield would not compensate him

12   for his extra hours.

13   151.   Mr. Hardy moved into the Oroville Inn in February or March 2009.

14   152.   When Mr. Hardy moved in, cockroaches infested the apartment.  The management knew about

15   the cockroaches, and Mr. Hardy requested on several occasions that they be eradicated.  The

16   management sprayed his apartment on a couple of occasions, but it was not enough to rid Mr.

17   Hardy's apartment of the cockroaches.

18   153.   The heat in Mr. Hardy's apartment did not work, and no attempts were made by the

19   management to restore the heat.

20   154.   The hot water faucet in Mr. Hardy's shower needed to run for about 30 minutes before it

21   warmed up.  The reason for this was because one of the hot water circulating pumps broke and Mr.

22   Benefield did not replace or repair it.

23   155.   Mr. Benefield would call Mr. Hardy and ask him to perform repairs.  Mr. Hardy repaired many

24   things at the Oroville Inn, and he knew the conditions of the building very well.

25   156.   One of the most serious problems Mr. Hardy observed at the Oroville Inn was the electrical

26   system on the ground floor and basement.  When Mr. Hardy first moved into the Oroville Inn,

27   electricity on these floors did not work at all because the fuse boxes were too rusted, old and

28   dangerous to power up.  As a result, there were no lights at the front door or in the lobby, creating

a safety hazard for the tenants and their guests.

157.   One of the other most serious problems that Mr. Hardy observed at the Oroville Inn was that the building had never been retrofitted for earthquake safety.  The structure of the building is composed of fortified concrete made out of silica sand.  Mr. Hardy believes that such concrete structures are unable to withstand earthquakes.

158.   In the summer of 2009, the City Attorney sent Mr. Hardy two requests to meet and answer some questions about the condition of the Oroville Inn.

159.   Mr. Hardy advised Mr. Jones of the requests and asked what Mr. Jones and Mr. Benefield would like him to do.  Mr. Hardy never received a response.

160.   In July 2009, the head of Code Enforcement, David Goyer, requested that Mr. Hardy meet with him and answer some questions.  This was the third request Mr. Hardy had received to meet and answer questions about the Oroville Inn.  Not seeing any harm in the meeting, Mr. Hardy set up an appointment for the following week.

161.   The same day, Mr. Hardy informed Mr. Jones that he had scheduled a meeting with the City Attorney and Mr. Goyer.

162.   The following morning, Jonothan Benefield fired Mr. Hardy and served him with a three day notice to pay rent or quit.

163.   Mr. Benefield fired and began eviction proceedings against Mr. Hardy as retaliation for scheduling a meeting to discuss the conditions of the Inn with the inspector and City Attorney.  Mr. Hardy had never heard any complaints from Mr. Benefield or Mr. Jones regarding his work.

164.   Mr. Hardy was personally handed the first three day notice to pay rent or quit by Jonothan Benefield in July 2009.  Mr. Hardy received several more in the mail before he moved out of the Oroville Inn on December 29, 2009.

165.   Mr. Hardy believes that Mr. Benefield took advantage of people who could not take care of themselves.

166.   Mr. Hardy has suffered emotional distress from his wrongful termination.  For several months, Mr. Hardy suffered from humiliation, shame, grief and anguish as a result of his wrongful termination.

**Jessica Graham and Rebecca Smith**

167.   Plaintiffs Rebecca Smith and Jessica Graham signed a three month lease renting unit 305 of the

Oroville Inn on January 5, 2010.  Ms. Smith and Ms. Graham moved into the Oroville Inn on or about January 10, 2010.  Ms. Smith and Ms. Graham pay $450.00 per month in rent.  Ms. Smith and Ms. Graham paid $700 to move in, $500 of which was a security deposit.

168.    Ms. Graham and Ms. Smith paid the full amount of their rent in January 2010: $450.  Because they did not move in until the 10th, Jerry Jones orally told them that their rent for January should have been pro-rated to exclude payment for the ten days that they did not reside in the Inn.  However, Jerry Jones had them pay the full amount of their rent in January and orally promised them that they would only have to pay $350 in February on account of the pro-rated days in January.

169.    When February came. Ms. Graham and Ms. Smith paid $350 in rent.  Ms. Graham and Ms. Smith were contacted by the management and told that they had to pay the full monthly payment.  When Ms. Graham and Ms. Smith told the management that they were only supposed to make a pro-rated payment that month pursuant to Mr. Jones's agreement, the management replied that it had no written evidence of that agreement and that they would nevertheless have to make the full payment.

170.    Ms. Graham and Ms. Smith received a three day notice to pay or quit in February 2010.

171.    When Ms. Graham and Ms. Smith moved into the apartment in January, Jerry Jones had them agree to take the apartment "as is."  The apartment had not been cleaned prior to move-in, and it was littered with furniture and cockroaches.

172.    Despite the condition, Ms. Graham and Ms. Smith were happy to simply have a place to live because they had been homeless before they moved into the Oroville Inn.  The Oroville Inn was the only place they could afford to live.

173.    The heater/air conditioning unit does not work at all in Ms. Graham's and Ms. Smith's apartment.  The metal radiator is smashed and looks as if it has been in a car accident.

174.    The toilet leaked when they moved in.  Water would constantly drip out from a hole in the tank next to the handle.  There was always water on the floor as a result.

175.    Ms. Graham and Ms. Smith requested that the management repair the hole.  The management was prompt about repairing the problem.

176.    Ms. Graham and Ms. Smith need to keep the window to their apartment open all the time

1    because if they do not, condensation accumulates on the walls of their apartment.

2    177.    Mold is growing in their bathroom.  The mold is similar in color to mold seen growing on the

3         hallway walls.  Ms. Graham and Ms. Smith clean the mold every week, but it always grows back.

4    178.    Paint is peeling in the bathroom and in the main room of their apartment.

5    179.    Ms. Graham and Ms. Smith have not been able to make repair requests recently because the

6         manager has not been in the office whenever they have visited.

7    180.    Both Ms. Graham and Ms. Smith have suffered emotional distress from living in the Oroville

8         Inn.

9    181.    Ms. Graham is scared to leave her apartment.  Ms. Graham suffers from anxiety that the mold

10        in the building will make her ill, and she suffers anxiety that the building will burn down.

11   182.    Ms. Smith also constantly suffers anxiety about the building burning down.  The fire alarm

12        goes off on a regular basis, and each time Ms. Smith becomes frightened and anxious.  She worries

13        when she leaves her apartment that the building will burn down with her dog inside.

14   183.    Both Ms. Smith and Ms. Graham have suffered from physical ailments since moving into the

15        Oroville Inn.

16   184.    Ms. Graham has been experiencing a lot of headaches and dizziness.  She feels lethargic and

17        tired, and she experiences a head rush when she stands.

18   185.    Ms. Smith has also been experiencing a lot of headaches and dizziness.  She also has

19        developed a lingering cough and chest congestion.

20   186.    Both Ms. Smith and Ms. Graham believe that their physical ailments are the result of

21        unsanitary, substandard, and untenantable conditions at the Oroville Inn.

22   **Ronda Hughes**

23   187.    Plaintiff Ronda Hughes signed a month-to-month lease for rent of a studio apartment in the

24        Oroville Inn.  Ms. Hughes moved in or about February 2009.  Ms. Hughes pays $400.00 per month

25        in rent, and she paid $400 as a security deposit.

26   188.    Ms. Hughes has noticed that mold grows in many places in the common hallways at the

27        Oroville Inn.

28   189.    Both of the sinks in Ms. Hughes's apartment leak.  The plumbing for the kitchen sink leaks

          underneath her cabinets.

190.    The unit across the hall from Ms. Hughes's apartment and the unit next to Ms. Hughes's apartment are both vacant.  The locks on the doors do not work, and there is a lot of mold growing in the rooms.

191.    Ms. Hughes has given Mr. Jones several written repair requests; the management has not responded.

192.    Ms. Hughes believes that the poor condition of the Oroville Inn has made her ill.  On some occasions she has vomited on account of the poor conditions at the Inn.

**Jerry Jones and Sandra S. Jones**

193.    Plaintiffs Jerry Jones and Sandra S. Jones signed a month-to-month lease to rent a one bedroom apartment at the Oroville Inn.  The Jones moved into unit 106 on or about July 2009. The rent for the Jones' apartment is $575 per month. No security deposit was collected.

194.    When the Jones moved into unit 106, there were holes in the front room ceiling, the bathroom wall, and the bedroom ceiling.  The holes ranged from the size of a golf ball to 8 inches in diameter. Only one of the four burners on the stove was in working order.  The smoke alarm did not work.  After a while, the heater stopped working.  Several of the vinyl tiles are loose, and the Jones must cover them with a rug so that they do not trip.

195.    There is mold growing in the common areas of the Oroville Inn. All throughout the Inn, the paint is cracking, chipping and peeling.

196.    There are also several vacant rooms with broken doors.  The floors, ceilings and walls in these rooms are covered with mold. Many of the ceilings leak and some have collapsed.

197.    There is a common kitchen and ballroom in the Inn.  The doors and vents to these rooms are broken, and the ceilings have collapsed from water damage.  Black mold grows on the drywall.

198.    Mr. Jones signed a contract for employment at the Oroville Inn on or about June 2009.  Under this contract, Mr. Jones was to become the manager of the Oroville Inn.  Mr. Benefield agreed to compensate Mr. Jones in the following manner: Mr. Benefield would credit Mr. Jones's $575 rent each month and also pay Mr. Jones $400 on the first and the 16th of each month.

199.    After a short time, Mr. Benefield fired the maintenance man and Mr. Jones assumed the responsibilities of the maintenance position as well.  Because of the additional responsibilities Mr. Jones was now undertaking, Mr. Benefield increased Mr. Jones's bi-monthly paychecks to $450.

Mr. Benefield also told Mr. Jones to keep track of his hours because Mr. Benefield would compensate Mr. Jones for all of his overtime on the first of the month. Mr. Jones recounts that his paychecks were usually two or three days late. Mr. Jones also never received any overtime compensation, even though he worked over ten hours of overtime each week at the request of Mr. Benefield.

200.   Mr. Jones was responsible for maintaining the units of the 50-60 tenants that lived in the roughly 35 occupied rooms at the Oroville Inn. Mr. Jones's other responsibilities as manager included rent collection, advertising, building repair and cleaning. Mr. Benefield called Mr. Jones every day and gave him very detailed instructions regarding what repairs to make on the building, and Mr. Jones was to complete as much of the repairs as possible on a budget of only $300 per month.

201.   When Mr. Jones began, there was a pile of work request orders that was about an inch thick. Some of the work requests were over a year old. Mr. Benefield told Mr. Jones to throw the work orders away and begin from scratch.

202.   When Mr. Jones performed repairs on the units at the Inn, he observed broken stovetops, leaky toilets, fallen plaster, broken (and sharp) shower tiles, improperly sealed windows, leaky plumbing, leaky roofs, and mold growing on drywall.

203.   Mr. Benefield told Mr. Jones that the city is out to get him. Mr. Benefield told Mr. Jones that the code violations were made-up.

204.   Mr. Jones kept records of when he worked each day. Mr. Jones averaged about 11 hours of work each day and about 18 hours of overtime each week.

205.   Mr. Benefield had Mr. Jones re-comb pipe wrap on some plumbing in the building. Mr. Jones re-combed about 200 feet of the wrap before stopping. Mr. Jones stopped because he believed that the wrap contained asbestos.

206.   One of Mr. Jones's responsibilities as manager was to collect rent. Every time someone paid rent, Mr. Jones would write a receipt. Mr. Jones would then go to the bank, deposit the money, and fax the deposit slip to Mr. Benefield. Sometimes the Benefields would stop by and pick up the rent money so that Mr. Jones did not have to go to the bank. Mr. Jones documented each time the Benefields picked up the money so that there was a paper trail of who received the rent money.

207.   Until January 22, 2010, most tenants paid their rent checks in cash.  Mr. Jones estimates that about 90% of the tenants paid their rent in cash.  After January 22, 2010, Mr. Benefield notified Mr. Jones that he only wanted to receive rent via check or money order.

208.   On or about January 21, 2010, Mr. Jones was ordered by the City Attorney to appear in Sacramento, California, for a deposition.  During his deposition, Mr. Jones was asked whether he had contacted OSHA and whether he had contacted an attorney on behalf of the tenants.  Mr. Jones claimed the Fifth Amendment privilege and refused to answer.

209.   Mr. Benefield was present at Mr. Jones's deposition.  During a break, Mr. Benefield pulled Mr. Jones aside and asked him if he had called OSHA or an attorney.  Mr. Jones replied that he did not want to answer those questions and that he is not sure why he asserted the Fifth Amendment privilege during the deposition.

210.   On or about January 22, 2010, Mr. Benefield faxed a note to Mr. Jones requesting that Mr. Jones collect rent from three tenants who had already paid their rent.  Mr. Jones was upset because Mr. Benefield knew that these tenants had already paid their rent that month, and he sent a note to Mr. Benefield stating that Mr. Benefield knew that those tenants had paid the rent. After this incident, Mr. Benefield told Mr. Jones that he was putting Mr. Jones on probation because the money was not accounted for.

211.   On February 8, 2010, Mr. Benefield stopped by the Oroville Inn and picked up the cash from rent payments between 11:30 am and 12:00 pm.  Joseph and Donald Durbin were present when Mr. Jones gave the rent money to Mr. Benefield.

212.   About 30 minutes later, Mr. Benefield came back with Rick Robertson and said, "Jerry, where's my fucking rent?"  Mr. Jones replied that he gave Mr. Benefield the rent a half hour earlier.  Mr. Benefield was furious, and demanded to be let into the office.

213.   Mr. Jones went to get the keys to the office and he called the police because he believed that Mr. Benefield was accusing him of embezzlement.   An officer from the Oroville Police Department arrived.

214.   The police officer began talking to Mr. Benefield, Mr. Robertson, and Mr. Jones.  In front of all of these men, Mr. Benefield accused Mr. Jones of being a "fucking liar" and a "fucking embezzler."

- 23 -

215.   While the police officer was there, Mr. Benefield requested that Mr. Jones sign an admission. Mr. Jones began reading the document, which stated that he, Jerry Jones, had embezzled money from Jonothan Benefield, among other things.  Once Mr. Jones read that statement, he gave the document back to Mr. Benefield and told Mr. Benefield that he would not sign something admitting to something that he did not do.

216.   When Mr. Jones refused to sign the admission letter, Mr. Benefield said "Fine, so here is your 30 day notice and you must be out of the building by March 9."  Mr. Benefield also fired Mr. Jones from his position as manager.

217.   The police officer left without arresting anyone.  To this day, Mr. Jones has not been arrested or charged with embezzling rent.

218.   After Mr. Jones was fired, a notice posted on the window of the office in the Oroville Inn accused Mr. Jones of embezzling money.  Mr. Benefield accused Mr. Jones of embezzling money during conversations that Mr. Benefield had with several tenants.

219.   On Friday, March 5, 2010 at 11:20 pm, Mr. Benefield called Mr. Jones and left the following voicemail: "Ah yeah hey Jer-, this is Jonothan Benefield.  Just wanted to let you know, Jerry, I got everything I need now to put you away. That's exactly what I'm gonna do. You have a good night's sleep, 'n just wanted to let ya know that – so ah you know what – that's exactly what's gonna happen. You take care."

220.   Mr. Jones has not received his last paycheck. Additionally, Mr. Benefield placed a stop payment on the previous paycheck that Mr. Jones received. Mr. Jones never received the money from that check.

221.   In the comments section for the Oroville Mercury-Register's article, "City Takes Step Toward Oroville Inn Abatement," a user with the username "Julie Benefield" posted a comment defaming Mr. Jones.  The comment reads, "You are fools to believe any thing [sic] that Jerry, The Now Ex Manager is reporting of late . . . he admitted to the felony charges against him. of course they were dropped. . . The state is broke and cant [sic] afford to pay for a public defender in a case against petty criminals. . . but remember the DA had to have evidence to bring charged [sic] against him in the first place."

222.   Later in the comments section, user "Julie Benefield" copies the text of a letter purporting to

have been written by Jonothan Benefield to Mr. Goyer.  The relevant sections of the letter state: "Mr. Jones was dismissed Monday February 8, 2010 in the presence of Rick Robertson, former Oroville Police Detective and Oroville Police Sergeant Bill Lagrone, for embezzlement of over $4700.00 There is an on going [sic] investigation and it seems that Mr. Jones has past convictions in Sacramento County Court in 2007," and "It is obvious that Mr. Jones is retaliating for his dismissal on Monday."

223.    At the end of February, Mrs. Jones had a bronchial spasm and had to be rushed to the hospital. Dr. Sohail Naseem, a pulmonary and nephrology specialist, informed Mrs. Jones that her bronchial spasm was likely caused by exposure to mold at the Oroville Inn.  Dr. Naseem recommended that Mrs. Jones not return to the Inn.  From that day forward, Mr. and Mrs. Jones never spent another night at the Oroville Inn.

224.    Mrs. Jones had experienced respiratory difficulties since she moved into the Oroville Inn.  Mrs. Jones began to feel better once she moved out of the Inn, but a cough lingers.  Judy Newman, the registered nurse who treats Mrs. Jones on a regular basis, also expressed to Mrs. Jones that Mrs. Jones's respiratory problems were probably caused by mold exposure at the Oroville Inn.

**Monique Karki**

225.    Plaintiff Monique Karki signed a month-to-month lease renting a one bedroom apartment at the Oroville Inn in August or September, 2006.  Ms. Karki paid $1000 to move into the Inn; $500 of that sum was for the deposit and the other $500 was the first month's rent.

226.    Ms. Karki moved into Apartment 410 in September 2006.  She moved into unit 410 with the understanding that she would be able to switch to a larger apartment, unit 312, once she cleaned it. Even though unit 312 was larger, the management informed Ms. Karki that she would only pay $500 a month to live there on account of the fact that she was going to clean it up.

227.    However, when Ms. Karki moved into unit 312, Bobby, the manager at the time, informed Ms. Karki that her rent was going to be $575 a month and that she owed an extra $75 in deposit. Eventually Bobby told Ms. Karki that she did not have to pay the extra $75 in deposit, as she often lent Bobby her truck to use to run errands for the Inn. Ms. Karki still pays $575 a month in rent.

228.    When Ms. Karki moved into unit 312, the stove would shock her each time she used it. Also, the temperature button on the stove was broken so that Ms. Karki was unable to turn the stove off

1    unless she turned off the circuit breaker for the kitchen.

2    229.    The managers were aware of the condition of the stove when Ms. Karki moved in.  Ms. Karki

3    and her husband made many requests to the managers in the building to repair the stove.  Ms.

4    Karki complained to Kelly (manager), Jim (repairman), and Jerry Jones (manager).  The managers

5    put in a repair request to Jonothan and Julie Benefield, who refused to set aside the funds required

6    to repair or replace the stove.  Ms. Karki waited a year and a half before the stove in her apartment

7    was replaced.  However, Ms. Karki's stove was neither repaired nor replaced with a new stove, but

8    rather it was "swapped" with a stove from another unit.  Ms. Karki's new stove does not give her

9    problems, but her old stove still shocks the renter of the other apartment (Tina Frederickson).

10   230.    The bathroom located off of Ms. Karki's living room has many problems.  The toilet leaks

11   from the bottom and also rocks back and forth.  Ms. Karki apprised Jerry Jones of the problems

12   with the toilet and he promised to find her some "shimmies" to balance it out.  No one ever

13   followed through on that promise.  Once, the toilet overflowed, flooding her apartment.  Jim the

14   repairman vacuumed 25 gallons of water off of Ms. Karki's floor.  Additionally, the cold water

15   does not work in the sink in this bathroom, only the hot water works.  Ms. Karki is unable to use

16   this sink because the hot water is so hot that it scorches her hands.

17   231.    The heat in Ms. Karki's apartment has not worked in over a year.  During the winter months,

18   she was forced to purchase a space heater to keep her home warm.  Even though her home has

19   more than one room, Ms. Karki would bundle up and close all the doors to the living room just so

20   that she could keep that room at a habitable temperature.

21   232.    Ms. Karki has requested several times that the management repair the heat in her apartment.

22   She filled out a repair order over a year ago.  Ms. Karki has even informed Julie Benefield that the

23   heat is not working in her apartment, yet nothing has been done.

24   233.    The windows in the living room, bedroom, and kitchen are lopsided and will not close all the

25   way.  As a result, her apartment is very drafty and water comes into Ms. Karki's apartment every

26   time it rains.  The rainwater has flooded her kitchen on occasions where heavy rains are

27   accompanied by heavy winds.  Also, the plaster around Ms. Karki's front door is broken off, and it

28   is possible for someone to peer into her home through the gap between the door and the wall.

234.    On March 3, 2010, the ceiling in Ms. Karki's bathroom fell down.  Ms. Karki complained to

- 26 -

the manager about it that very day, and the manager came up to inspect it on March 4, 2010. However, the manager has done nothing to repair the problem. Ms. Karki noticed mold growing on the plaster that fell from her ceiling, and she can see the floor of the unit above her.

235.   Ms. Karki reports that there is mold growing around the windows in each of her rooms. Additionally, the paint and plaster is flaking off around the windows.

236.   Ms. Karki's apartment is currently plagued by mice. They get into any food or boxes that she leaves on the counters, and they leave droppings everywhere. Ms. Karki must re-wash every plate, glass or utensil that she stores in her drawers before using it on account of the mice. Ms. Karki expressed that she believes that the mice have driven out her previous infestation of cockroaches. On one occasion, Ms. Karki's husband woke up to the sensation of a mouse licking his ear and then scurrying down his chest.

237.   Ms. Karki complained to Bill William about the mice. Mr. William placed a sticky box next to Ms. Karki's couch. Within 24 hours, a mouse was trapped inside the box. Despite the box, mice still plague Ms. Karki's apartment.

238.   Ms. Karki has requested that the management repair the problems with her apartment on several occasions. Ms. Karki has often been promised that the management will make the repairs, and then the repairs are never made. Unless Ms. Karki constantly requests that the management repair the problems in her apartment, months will go by without any response.

239.   The current condition of Ms. Karki's apartment deprives her of the full use and enjoyment of the space. When it is cold outside, Ms. Karki must confine herself to one room to remain warm. Currently, Ms. Karki cannot use one of her bathrooms because the floor is covered with plaster that fell from the ceiling. Ms. Karki cannot use the sink in the other bathroom because the cold water does not work. Ms. Karki also cannot leave boxes of food out on her counters, as mice will get into them.

240.   Ms. Karki has suffered anguish and anxiety on account of the poor conditions of her home in the Oroville Inn.

241.   Ms. Karki last paid rent in February 2010. She paid $575. Ms. Karki did not pay rent in March 2010 on account of the fact that the ceiling in her bathroom collapsed and the management has not repaired it yet.

242.   While Ms. Karki has lived in the Oroville Inn, she has contracted pneumonia four times.   Ms. Karki had never had pneumonia before moving into the Oroville Inn.   Ms. Karki told Mr. Jones that she contracted pneumonia and that she thought it was on account of the conditions at the Inn.

243.   Ms. Karki still lives in the Oroville Inn.   She cannot afford to move elsewhere.   Her only source of income is an $850 Social Security Disability payment that she receives each month.   Once she pays her rent and utilities, she only has about $60 left for food and other incidentals.

**John MacDonald**

244.   Plaintiff John Macdonald signed a lease to rent a one-bedroom apartment at the Oroville Inn.   Mr. MacDonald moved into the Oroville Inn on or about July 2009.   Mr. Macdonald pays $525.00 per month in rent, and he also paid $500 as a security deposit.

245.   Initially, Mr. MacDonald moved into unit 216.   Everytime it rained, the ceiling leaked badly.   Mr. MacDonald requested that the management repair the problem, and management moved Mr. MacDonald into another unit.

246.   When Mr. MacDonald moved into the new unit, the stove did not work. There were holes in the wall. There was a separation between the walls and the floor in the bathroom of about a half inch.

247.   Mr. MacDonald's apartment has a cockroach problem.   They have even infiltrated his microwave oven.

248.   Mr. MacDonald asked for pest control when he signed the lease for the apartment.   The management came and sprayed once, but it did not remedy the problem.   Mr. MacDonald made subsequent requests for additional pest control that went unheeded.

249.   Mr. MacDonald noticed that mice had gotten into his apartment at the end of February 2010.   The mice have eaten holes in the walls and cabinets, and they leave droppings all over his apartment.

250.   Mr. MacDonald has requested pest control for the mice, and all the management has done is give Mr. MacDonald one small mousetrap.

251.   Mr. Jones promised Mr. MacDonald that everything was going to be repaired in his new apartment.   The stove was the only thing that was repaired.

252.   Mr. MacDonald relied on that promise when he decided to move into the Oroville Inn, and he

relied on that promise to his detriment.

253.    Mr. MacDonald also suffers emotional distress from living in the Oroville Inn. He is worried about contamination in the air because other tenants are sick and have breathing problems. He is embarrassed about the condition of the building, and he is too ashamed to invite guests to visit.

**Scott R. Martin**

254.    Plaintiff Scott R. Martin has lived in the Oroville Inn twice in the past decade. Mr. Martin first moved into the Oroville Inn in 2006 or 2007. He stayed there for nine months before he was served with a three day eviction notice. Mr. Martin thinks that he was given the eviction notice because he paid half of his rent on the day when the full rent payment was due, and he would later pay the other half of his rent payment (plus a late fee) two weeks later.

255.    Mr. Martin moved into the Oroville Inn for the second time on or about October 1, 2009. Mr. Martin signed a three-month lease for a studio apartment to begin on November 1, 2009, and he paid $425 as a security deposit and $425.00 in rent. Mr. Martin has an oral agreement with the management whereby he pays half of his rent on the first of the month and the other half in the middle of the month (plus a $25 late charge).

256.    Mr. Martin first moved into unit 206, but he had to move to unit 401 because unit 206 was infested with rodents and cockroaches.

**Dale Melvin**

257.    Plaintiff Dale Melvin signed a three-month lease to rent unit 201 of the Oroville Inn, a studio, on September 16, 2009. In that lease, Mr. Melvin agreed to pay a $400 security deposit and $400 in rent per month starting on October 1, 2009.

258.    Mr. Melvin moved into the apartment in September 2009, and the rent was pro-rated for that month. Mr. Melvin tendered $600 on September 16, 2009, and the remaining $299.95 was due on October 1, 2009. Mr. Melvin and Mr. Jones signed a paper memorializing this payment and agreement to pay on September 16, 2009.

259.    When Mr. Melvin moved into his apartment, the lock did not work correctly. Due to some rotten wood, the lock did not fully shut. Mr. Melvin informed Mr. Jones of the problem in February 2010, and a few weeks later Mr. Jones and Nick repaired the lock after removing the rotten wood.

260.   Currently, there is a three inch long hole in the ceiling in Mr. Melvin's ceiling. Mr. Melvin has observed mold and rodent feces in the ceiling through the hole.

261.   Mr. Melvin no longer has a stove in his apartment. When the stove was working, Mr. Melvin would turn on the burner and watch it for a minute in order to determine what temperature the burner had reached, as the temperature knob often did not work correctly. Once, Mr. Melvin turned on the burner, and after a minute, the burner became extremely hot and sent white sparks shooting into the air. Mr. Melvin's stove has not worked since.

262.   Mr. Melvin requested that the management repair the stove, and Mr. Jones came and attempted to repair the stove. Mr. Jones was unable to repair the stove. The Benefields have refused to allot the funds required to purchase Mr. Melvin a new stove.

263.   The plumbing servicing the hot water faucet in Mr. Melvin's apartment leaks behind the wall. As a result, the wood behind the sink in his apartment is rotting and Mr. Melvin worries that the rotten wood will soon be unable to support the weight of the sink.

264.   When Mr. Melvin moved in, the freezer in his refrigerator was completely iced over and the refrigerator did not cool down. Mr. Melvin requested a new refrigerator, and Mr. Jones brought a new refrigerator to Mr. Melvin's apartment. The old refrigerator was never removed.

**Robert Rosas**

265.   Plaintiff Robert Rosas signed a lease and moved into the Oroville Inn in the fall of 1999. Mr. Rosas signed a six month lease for a studio apartment. At the time, Mr. Rosas paid $260 per month in rent. Currently, Mr. Rosas pays $330 per month in rent. Mr. Rosas has received a letter in the mail every time his rent has increased.

266.   Mr. Rosas's rent was raised to $330 not long before the whole building was shut down for repairs in the mid-2000s. Mr. Rosas received a letter in the mail from Julie Benefield informing Mr. Rosas that they were increasing his rent to help pay for the upcoming required repairs.

267.   Once, Mr. Rosas's wallet was stolen and he lost about $900. As a result, he was unable to make his rent that month. Mr. Rosas went and told the manager that he would not be able to make rent that month because his wallet was stolen. The manager told him not to worry, that they would work something out. Nevertheless, the following day Mr. Rosas was served with a three day notice to pay or quit.

268.    About four months after Mr. Rosas moved in, he developed asthma.  Mr. Rosas has not suffered from Asthma before.  He exercises, does not drink, and does not smoke.  As a result, Mr. Rosas believes that the unsanitary and untenantable conditions of the Oroville Inn have caused him to develop asthma.

269.    While Mr. Rosas has lived at the Oroville Inn, he has gone to the emergency room on six different occasions because he had an asthma attack and his inhaler did not help.

270.    Mr. Rosas has contracted several illnesses while he has lived at the Oroville Inn, and Mr. Rosas believes that the unsanitary, substandard, and untenantable conditions of the Inn contributed to or caused his illnesses.   These illnesses are commonly characterized by difficulty breathing, coughing, and other respiratory problems.

271.    Once, Mr. Rosas contracted pneumonia and had to make several trips to the emergency room. Overall, Mr. Rosas has made between 15 and 20 trips to the hospital and emergency rooms because of illnesses he contracted while living at the Oroville Inn.

272.    Mr. Rosas worries that asthma is going to continue to affect his life, possibly shortening it.  Mr. Rosas worries about contracting other illnesses and diseases because of the unsanitary and untenantable conditions of the Oroville Inn.  Mr. Rosas is also worried about the safety of living in the Oroville Inn.

273.    Mr. Rosas has lived in three different studio units at the Oroville Inn: unit 212, 216 and 319. Mr. Rosas currently lives in unit 319.

274.    Mr. Rosas had to move out of unit 212 because the shower in his unit leaked down to the main lobby.

275.    While Mr. Rosas was living in unit 212, he suffered embarrassment and anger when one of the maintenance persons tried to let himself into Mr. Rosas's apartment after Mr. Rosas finished taking a shower.  The maintenance man tried to let himself into Mr. Rosas's apartment because the ceiling in the lobby had begun to leak when Mr. Rosas turned on his shower.

276.    Instead of fixing the leak in Mr. Rosas's shower, the management of the Oroville Inn had him move into unit 216.

277.    About a month after Mr. Rosas moved into unit 216, mold blossomed on the wall.  It was not long before the mold covered the wall.

278.   Mr. Rosas spoke to Mr. Benefield about the mold on his wall in 216.  Mr. Benefield claimed that it was the first time that he had heard about mold in the Oroville Inn, and Mr. Rosas thought that Mr. Benefield was lying because other tenants had suffered from mold in their apartments for a long time.

279.   Unit 216 and unit 212 were both infested with cockroaches when Mr. Rosas lived there.

280.   The management requested that Mr. Rosas move from unit 216 to unit 319.

281.   When Mr. Rosas moved into 319, there was a leak in his bathroom above his shower.  He reported the problem to the management, who came into his apartment and fixed the plumbing.  The management never finished the job, however, as there are holes in the ceiling where the plaster has not been replaced.  Mr. Rosas made a written repair request regarding the holes on or about 2006.  A Manager promised to come and repair those holes, but no one ever has.

282.   Mr. Rosas occasionally finds cockroaches in his apartment.  Because Mr. Rosas is vigilant about spraying Raid and always cleaning up after himself, the only way for the cockroaches to get in is through the holes in Mr. Rosas's bathroom ceiling.  In fact, Mr. Rosas often finds the cockroaches in his bathroom.  He makes sure to check for them before he takes a shower.

283.   The heater/air conditioning unit in Mr. Rosas apartment does not work.  Mr. Rosas requested that the unit be repaired on or about 2006.  The manager at the time told Mr. Rosas that he would come by to repair it, but no one from the management ever came.

284.   Currently, there is mold growing on the walls in Mr. Rosas's kitchen.  There is mold behind pictures that he has on the walls, mold near the kitchenette, and mold on the wall near the window.

**Jack L. Smith**

285.   Plaintiff Jack L. Smith moved into the Oroville Inn in 2000, roughly ten years ago.  Mr. Smith pays $342.00 per month for his studio apartment.

286.   Two of Mr. Smith's outlets have black spots on them as if they have been burned.

287.   Often, when it rained in Oroville, the rain would leak all the way down to the first floor of the Oroville Inn.  The rain caused the plaster and stucco to fall from the walls and ceiling.  Mr. Smith has seen standing puddles of water in the lobby of the Oroville Inn from the rain.

288.    Mr. Smith is concerned that repair work has not been performed on the Oroville Inn, and he thinks that it is apparent that a lot of the structure is in dire need of repair and cleaning.

**Travis Spinale**

289. Plaintiff Travis Spinale signed a three-month lease to rent unit 407, a studio apartment in the Oroville Inn, on June 5, 2009. Mr. Spinale paid $425 as a security deposit, and he pays $425.00 per month in rent.

290. The heat in Mr. Spinale's apartment did not work when he moved in and it still does not work. The management told Mr. Spinale that it did not work when he moved in, and Mr. Spinale made several requests to Kelly to replace the heater in his apartment. Once Mr. Jones attempted to repair the heater but he was unable to do so. Mr. Jones informed Mr. Spinale that the owners were not going to pay for new heaters. As a result, Mr. Spinale must use a space heater to keep his apartment warm.

291. Mr. Spinale's apartment is infested with cockroaches. He kills them almost every day. Mr. Spinale has requested that Kelly and Mr. Jones help rid him of his infestation, but nothing has been done.

292. The ceiling in the apartment sags where there is a leak.

293. A dark gray matter which Mr. Spinale believes is mold grows along the windowsills in his apartment.

294. Currently, two of the electrical outlets in Mr. Spinale's apartment do not work. Mr. Spinale has requested that these outlets be repaired, but nothing has been done.

295. The toilet in Mr. Spinale's apartment is not bolted down, and it rocks back and forth. Persons using the toilet need to be careful not to shift their weight or the toilet may come loose and begin leaking.

296. Mr. Spinale has felt unwell since he began living at the Oroville Inn. He experiences coughing, feels congested and has difficulty breathing.

297. These symptoms subside if Mr. Spinale spends more than a day or two away from his apartment at the Oroville Inn. As a result, Mr. Spinale believes that these symptoms are a caused by the poor conditions of the Oroville Inn and his apartment.

298. The poor conditions of the Oroville Inn and Mr. Spinale's apartment have caused him much frustration and anger. Mr. Spinale is worried that the poor conditions of the Oroville Inn and his apartment will affect his health and shorten his life span.

**Nita Webster**

299.   Plaintiff Nita Webster signed a three-month lease to rent a one-bedroom apartment in the Oroville Inn. Ms. Webster moved into the Oroville Inn on or about October 1, 2009. Ms. Webster pays $500.00 per month for her one bedroom apartment.

300.   When Ms. Webster moved into her apartment, she noticed that the refrigerator had not been cleaned. As Ms. Webster was cleaning the refrigerator so that she could put food in it, she noticed that cockroaches were living in the refrigerator. Ms. Webster was upset about this, and she notified Jerry Jones right away. Mr. Jones informed her that a man would come to spray her apartment the following day. The following day, Ms. Webster's apartment was sprayed. However, the cockroaches remain. Ms. Webster is forced to re-clean her dishes each time she uses them because of the cockroaches. During the second week of March, 2010, Ms. Webster went to retrieve some ice cubes from the freezer. When she pulled the tray out of the freezer, she discovered that several cockroaches had become frozen in the ice cubes.

301.   In February 2010, Jonothan Benefield and another man knocked on Ms. Webster's door. Ms. Webster informed Mr. Benefield that her apartment was overrun with cockroaches. Mr. Benefield replied that it was Ms. Webster's fault that cockroaches lived in her apartment. Ms. Webster was offended by Mr. Benefield's comment.

302.   During his visit in February 2010, Mr. Benefield also asked Ms. Webster if she had ever given Jerry Jones cash while he was the manager at the Oroville Inn. Ms. Webster replied that she had not; she always pays her rent via money order. Mr. Benefield then informed Ms. Webster that Jerry Jones is a thief.

303.   Recently, Ms. Webster was in bed asleep when she awoke to the sound of scurrying and saw a large mouse or rat run across her bedroom floor. She has also heard rodents chewing on her walls on several occasions.

304.   The heating unit in Ms. Webster's apartment is part air conditioner and part heater. The heater did not work correctly when Ms. Webster first moved into her apartment: it just blew cold air into her apartment. She informed Mr. Jones of this problem in October. Mr. Jones came by and repaired the heater. The heater continued to work for about two weeks before it stopped emitting heat again.

305.   Ms. Webster requested that Bill repair the heater.  Bill tinkered with the heater and it worked properly for a couple of days before breaking again.

306.   Ms. Webster has not requested that the heater be repaired because it made her feel ill when it did work.  When the heater was on and working, it emitted a smell that gave Ms. Webster a headache, made her sick to her stomach, and made her feel dizzy and lightheaded when she stood. Ms. Webster generally did not suffer from these symptoms except when the heater was turned on. Ms. Webster also noticed that if she went outside for more than five or ten minutes when the heat was on in her apartment, her headache and nausea would begin to dissipate.  As a result, Ms. Webster was worried the heater was emitting carbon monoxide and that the carbon monoxide was causing her to feel ill.

307.   The management has provided Ms. Webster with an oil heater which uses electricity to produce heat.  Ms. Webster is unable to afford to pay for the electricity to power this heater because she is on a repaired income and spends most of her income on prescription medications and her rent.

308.   It is very uncomfortable in Ms. Webster's apartment without heat.  Ms. Webster has poor circulation as a result of chronic heart problems.  In addition, the windows in her apartment do not adequately keep out the weather.  When the wind blows, Ms. Webster feels a draft in her apartment.  The draft is so strong that it has caused her lamp shade to move.

309.   In December, Ms. Webster left her apartment and went to her daughter's home to do her laundry because the laundry machines at the Oroville Inn were not working.  Ms. Webster had just finished making herself lunch on the stove, and she made sure to turn it off before she left.  Ms. Webster was gone for almost four hours.  When she returned, her apartment was full of smoke. Despite the fact that her apartment was full of smoke, neither the smoke detector in her apartment nor the one in the hall alerted.  Ms. Webster opened a window and then left the apartment, as her heart condition can be exacerbated by smoke inhalation.  Mr. Jones determined that one of the burners on Ms. Webster's stove had shorted out.  Ms. Webster no longer uses her stove.

310.   The window in Ms. Webster's kitchen is positioned above her stove.  When it rains, the window is unable to keep out the rain.  As a result, the wood countertop behind the stove has begun to rot away, leaving a large hole.  Additionally, the countertop on the side of the stove is

1   buckled and wavy, also due to water damage.

2   311.   Recently, Ms. Webster heard a noise coming from one of her outlets and her light went out.

3   When she looked down, she noticed that a little bit of smoke was coming out of the outlet and that

4   the plug had become blackened.  Ms. Webster's lamp that was plugged into that outlet no longer

5   works.

6   312.   Since the end of January 2010, Ms. Webster has been plagued by loud music played by another

7   tenant in the Oroville Inn.  The music plays almost every day, and it usually plays between 4 hours

8   and 24 hours each day.  Ms. Webster must take out her hearing aids because the music is so loud

9   and often causes her to get migraine headaches.  In fact, the music is so loud that it has caused a

10  mirror and a picture to fall off of Ms. Webster's walls (breaking the picture and frame), and her

    television almost vibrated off of the end of her table.

11  313.   Ms. Webster informed Mr. Benefield that the loud music was substantially interfering with her

12  use of her apartment; Mr. Benefield promised to do something about it that day.  However, the

13  music only got louder that day and it has not abated.  Ms. Webster believes that Mr. Benefield is

14  encouraging the tenant to play loud music to harass Ms. Webster and drive her out of the building.

15  314.   Ms. Webster has not received any mail in February or March 2010.  Ms. Webster thinks that

16  someone from the management of the Oroville Inn may be intercepting her mail.

17  315.   Once, when Ms. Webster was using the heater, she began to feel ill.  She got up to use the

18  bathroom, became dizzy and then fell.  When she fell, she fractured her wrist.  Ms. Webster

19  attributes the dizzy spell to the smell from the heater.

20  316.   Ms. Webster believes that living in the Oroville Inn has negatively affected her health.  She

21  noticed about three weeks after she moved in that she was feeling poorly: she had more headaches

22  than she'd had in a long time, she has had many more dizzy spells than she had elsewhere, her

23  breathing has become more difficult, and she often feels congested.  It is not uncommon for her to

24  experience flu-like symptoms since she began living at the Oroville Inn.  Before she moved in, Ms.

25  Webster felt much healthier and did not experience these symptoms nearly as frequently as she

26  experiences them while living at the Inn.

27  317.   Ms. Webster has spoken to her cardiologist, Dr. Peter Wolk, about the potential causes of her

28  dizzy spells.  Ms. Webster recounted that she had not experienced these spells much before she

- 36 -

1   moved into the Oroville Inn.  Dr. Wolk informed Ms. Webster that he believes that her dizzy spells

2   are caused by the poor conditions of the Oroville Inn.

3   **Sean W. Wood Jr.**

4   318.   Plaintiff Sean W. Wood Jr. signed a lease to rent a one bedroom apartment at the Oroville Inn.

5   Mr. Wood moved in on or about May 1, 2008.  When Mr. Wood signed the lease, he also signed a

6   mold controlment plan, a key replacement plan, a promise to bleach his room if necessary (due to

7   mold), and rules and regulations of the building.  Mr. Wood paid $525 as a security deposit, and

8   his rent was $425 per month.

9   319.   In January 2010, the Oroville Inn increased Mr. Wood's rent to $550 per month.   The

10   management never informed Mr. Wood of this fact until after he paid his January rent.

11   320.   When Mr. Wood first moved in, he moved into unit 207.  Mr. Wood moved out of unit 207 and

12   into unit 304 within a week because unit 207 had no hot water.

13   321.   Mr. Wood has received a three day pay or quit notice and a "courtesy reminder" letter in

14   January 2010.

15   322.   Mr. Wood's apartment is infested with mice.  The infestation is so bad that, on one particular

16   night, Mr. Wood killed three different mice in his apartment.  The mice have left droppings all

17   over his apartment, and they get into any food that he leaves on the counter or in the cabinets.

18   323.   Mr. Wood has requested that the management remedy his mouse infestation.  Mr. Jones gave

19   Mr. Wood mousetraps and caulking so that Mr. Wood can attempt to seal the holes where the mice

20   come in.  Mr. Jones told Mr. Wood that he had to purchase the mousetraps and caulking out of his

21   own pocket because the owner would not allot sufficient funds each month to make all of the

22   necessary repairs.

23   324.   The refrigerator in Mr. Wood's apartment did not work correctly when he moved in.  The

24   manager at the time, Jerry Jones, knew about the problem and told him that it would be repaired.

25   However, no one ever attempted to repair it.  After a while, Mr. Wood could not live without a

26   refrigerator any longer and he went out and purchased one himself for his apartment.

27   325.   Mr. Wood has seen mold growing in the hallway on the second floor.  Mr. Wood relates that

28   there is a corner of the hallway where mold, mushrooms and fungus grow on the wall.

326.   The outlets in unit 304 hang out of the walls.

327.    The management of the Inn has only come by Mr. Wood's apartment once to make repairs.  On that occasion, the management put some caulking on the baseboards of Mr. Wood's bathroom.

328.    Mr. Wood thinks that he has become sick due to the poor conditions of the Oroville Inn.  Mr. Wood has suffered from a runny nose, sore throat, coughing, congestion, and difficulty breathing.  Mr. Wood attributes the cause of these symptoms to the unsafe and untenantable conditions of the Oroville Inn.

329.    Mr. Wood suffers from emotional distress due to the fact that Defendants have failed to maintain the safety, usability and habitability of the Oroville Inn.  Mr. Wood suffers from anxiety most every day that the poor conditions of the Oroville Inn have made him ill and affected his well being.

**Defendants' Common Plan and Scheme to Defraud and Unfair Business Practices**

330.    Upon information and belief, Plaintiffs allege that Defendant Walnut Hill Estate violated both federal and California law when failing to maintain the Oroville Inn in a tenantable manner constructively forcing Plaintiffs out of their apartments through tactics of harassment, misrepresentation, fraud, and unlawful business practices.

331.    In 1999, Walnut Hill Estate Enterprises LLC obtained ownership of the Oroville Inn, located at 2066 Bird Street, Oroville, California.   The Oroville Inn was built in 1929 and has a total of sixty-one units.

332.    Defendants Jonothan Benefield, Julie Benefield, Walnut Hill Estate Enterprises, and Does 1 through 100 ("Defendants") conspired and enacted a common plan and scheme to defraud tenants out of rents monies for substandard and untenantable apartments.

333.    Despite years of substandard and untenantable conditions at the Oroville Inn, Defendants claim the right to collect rent from Plaintiffs.

334.    Defendants conspired and enacted a common plan and scheme to make empty promises and knowing misrepresentations to current and prospective tenants with the intent that they rely on these promises and misrepresentations to their detriment.  Plaintiffs have relied on these promises and misrepresentations to their detriment.

335.    Defendants conspired and enacted a common plan and scheme to unlawfully evict tenants who lawfully asserted their rights not to pay rent for substandard and untenantable apartments.

336.   Defendants conspired and enacted a common plan and scheme to target disabled persons as victims of their fraud and unfair business practices, knowing that disabled persons were more likely to be victimized by their common plan and scheme.

337.   The acts and omissions described herein demonstrate the harm and other impact that Defendants' common plan and scheme has caused with respect to the property and physical and mental well-being of the Plaintiffs.

338.   Defendants' common plan and scheme, known to each and every Defendant, has also harmed and will continue to similarly harm numerous other tenants in Oroville.

339.   The acts and omissions described were undertaken by Defendants for the specific purpose of furthering their pre-existing common plan and scheme to defraud tenants out of rent monies for substandard and untenantable apartments.

340.   Defendants further undertook the acts and omissions described herein, knowing them to be fraudulent and misleading to the tenants at whom they were specifically directed, intending those tenants to rely on those fraudulent and misleading actions and knowing those acts and omissions to be of a kind that would reasonably influence those tenants to part with rent monies and incur significant costs to their health by beginning to rent or continuing to rent residences at the Oroville Inn.

341.   Defendants used the United States mail and interstate wire as a necessary part of their common plan and scheme to defraud and unfair business practices.  Defendants transmit by interstate telephone call and United States mail a substantial portion of the communications required to further their common plan and scheme. The Defendants have made it their regular business practice to utilize these avenues of communication to transmit unlawful demands for rent, fraudulent misrepresentations, false promises, and other communications necessary to furthering their common plan and scheme to defraud the tenants of the Oroville Inn.

342.   The behavior of Defendants, as stated above, establishes a pattern of racketeering behavior knowingly understood and undertaken by all Defendants so named above, and for the express purpose of defrauding tenants of the Oroville Inn of their rights to quiet enjoyment of their apartments.  This behavior also has been taken in reckless disregard to the serious health risks created by the Defendants' refusal to repair or replace dangerous and faulty building conditions.

Defendants' Bankruptcy

343.    Defendants contend that Defendant Walnut Hill Estate Enterprises, LLC has filed for Chapter 11 reorganization with the United States Bankruptcy court for the Northern District of California.

344.    Defendants contend that all actions regarding the Oroville Inn have been stayed during the pendency of the Bankruptcy proceedings.

345.    However, no entity named "Walnut Hill Estate Enterprises, LLC" has filed for Chapter 11 reorganization with the United States Bankruptcy Court for the Northern District of California.

346.    An entity named "W.H.E. Enterprises, LLC" has filed for Chapter 11 reorganization with the United States Bankruptcy Court for the Northern District of California.   Plaintiffs have been unable to verify that this is indeed the same entity as Walnut Hill Estate Enterprises, LLC. Additionally, "W.H.E. Enterprises, LLC" claims that it has less than $50,000 worth of assets. Walnut Hill Estate Enterprises, LLC, is the owner of record of, among other things, a five-story historic building with over 35 apartments that collects well over $150,000 in rents in a year's time.

347.    Each claim below is alleged as to all Defendants, including Does 1-10.

## FIRST CAUSE OF ACTION

**For violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, Mail Fraud Act, 18 U.S.C. § 1341, and Wire Fraud Act 18 U.S.C. § 1343**

**(Against All Defendants)**

348.    Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

349.    At all relevant times, Defendants were "persons" and "enterprises" within the meaning of the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3)-(4) and § 1962(c).

350.    At all relevant times, Defendants were engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

351.    Defendants initiated and continue to engage in a business practice designed to defraud Plaintiffs of rent monies for unsafe, untenantable, and unusable apartments in violation of RICO.

352.    Defendants initiated and continue to engage in a practice designed to defraud Plaintiffs by wrongfully evicting them from their apartments once they refuse to pay rent due to the unsafe, substandard and untenantable conditions, thus making room for paying tenants.

353.    At all relevant times, Defendants, and all other conspirators associated with Defendants,

conducted and/or participated, directly and/or indirectly, in the conduct of Defendants' real estate affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO 18 U.S.C. § 1962(c).

354.  Specifically, Defendants engaged in "racketeering activity" by engaging in the acts set forth above.  Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, and conspired to do so, through a pattern of racketeering activity and within the meaning of 18 U.S.C. § 1961(5), that is, Mail Fraud in violation of 18 U.S.C. § 1341, and Wire Fraud in violation of 18 U.S.C. § 1343.

355.  The acts set forth above and the continued fraudulent harassment of Plaintiffs by means of mail, telephone and facsimile, constitute a violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud).

356.  The acts of racketeering constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts were related to each other by virtue of common participants, a common victim (tenants of the Oroville Inn), a common method of commission (by mail, telephone, and facsimile), and the common purpose and common result of defrauding the tenants out of rent monies.  The common result also included the enrichment of Defendants' real estate portfolios through ill gotten gains.

357.  Defendants' fraudulent scheme continues to this day.

358.  As a result of Defendants' misconduct and violation of RICO, Plaintiffs lost thousands upon thousands of dollars in the fraudulent scheme.

359.  Pursuant to RICO, Plaintiffs are entitled to recover threefold its damages, plus costs and attorneys' fees from Defendants.

360.  Defendants engaged in the business practice of contacting Plaintiffs repeatedly via mail and telephone for the purpose of obtaining fraudulent rent monies, and for the purpose of fraudulently evicting tenants who refused to pay rent because of nuisances, substandard conditions, and untenantable conditions.

361.  Defendants' use of the mail and telephone violates the Mail Fraud Act and Wire Fraud Act.  Defendants, having devised a scheme, obtained property from Plaintiffs by means of false and fraudulent pretenses.  Defendants made fraudulent pretenses by mail and over the telephone to

Plaintiffs, namely, by misrepresenting to Plaintiffs that building conditions were safe and that unsafe or broken building conditions would be repaired in a timely manner, and by omitting information regarding the health and safety hazards created by the conditions of the Oroville Inn.

362.    Defendants contacted Plaintiffs by means of mail and telephone wire for the purposes of defrauding Plaintiffs and in violation of the Mail Fraud Act and Wire Fraud Act.

363.    By engaging in mail and wire fraud, Defendants further violated the Racketeer and Corrupt Organizations Act.  As defined, "racketeering" includes the use and pattern of mail or wire fraud to receive income.  Defendants received income derived from a pattern of mail and wire fraud. Defendants defrauded tenants out of rent monies.  By omitting important facts, misrepresenting other facts and making false promises, Defendants improperly defrauded Plaintiffs out of rent monies.

364.    Plaintiffs relied on Defendants intentional misrepresentations via telephone and facsimile, and after a pattern of mail fraud, wire fraud, harassment, and hostility, accepted Defendants' representations as true.  Plaintiffs relied on Defendants' intentional misrepresentations to their economic and physical detriment.

365.    Defendants' actions violate the Racketeer and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, the Mail Fraud Act 18 U.S.C. § 1341, and the Wire Fraud Act 18 U.S.C. § 1343. 18 U.S.C. § 1962 states that "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt…to use or invest…the proceeds of such income."  The Mail Fraud Act prohibits any article sent by post in furtherance of a scheme to obtain "money or property by means of false or fraudulent pretenses."  Further, the Wire Fraud Act prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," communicated by writing or sound via wire.

366.    Defendants, under a scheme headed by Jonothan Benefield, did intentionally and unlawfully move Plaintiffs to begin renting or remain renting untenantable apartments at unjustifiably high rent prices.

367.    Defendants have engaged in acts, each of which is a necessary part of their scheme to defraud Plaintiffs out of rent monies for unsafe, untenantable, and unusable apartments, each of which

- 42 -

were known by Defendants to be false or fraudulent at the time they were made, and each of which is of a kind that would reasonably influence a tenant into parting with money or property.

368.    18 U.S.C. § 1962 allows that any person injured in his property because of a violation of this section, may sue in United States district court, "and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

369.    As a direct and proximate result of these violations, Plaintiffs were and continue to be damaged in an amount according to proof, including, without limitation, statutory damages and actual damages, such as payments of rent and other charges collected by Defendants.

370.    Pursuant to 18 U.S.C. § 1962, Plaintiffs are entitled to recover actual damages sustained as a result of Defendants' violations of the Wire Fraud and Racketeer and Corrupt Organizations Acts, in an amount to be determined at trial, statutory damages, and attorney fees and costs.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For an amount according to proof to be shown at trial, trebled in accordance with 18 U.S.C. § 1964(c), representing the actual damages suffered by Plaintiff including, but not limited to, mental suffering, anxiety, humiliation, and emotional distress;

B.  For an amount according to proof to be shown at trial representing actual, treble, and punitive damages in accordance with California State law;

C.  For the costs of investigation and processing of claims for loss in an undetermined amount, trebled in accordance with 18 U.S.C. § 1964(c);

D.  For the costs of suit in accordance with 18 U.S.C. § 1964(c); and

E.  For reasonable attorney fees in accordance with 18 U.S.C. § 1964(c) and State law.

F.  For such other and further relief as this Court may deem just and proper, in accordance with 18 U.S.C. § 1964(a), including, but not limited to:

G.  The imposition of a constructive trust with tracing, and interest;

H.  A Court order that Defendant Walnut Hill Estate Enterprises LLC divest any and all interest in 2066 Bird Street, Oroville, California;

I.  A Court order imposing reasonable restrictions on the future activities or investments of all Defendants, including, but not limited to, prohibiting Defendants from engaging in property investments or management affecting interstate or foreign commerce.

J.   A Court order dissolving or reorganizing Defendants, making due provision for the rights of innocent persons;

K.   A Court order mandating that Defendants cease all nuisances, substandard conditions and untenantable conditions at the Oroville Inn within 30 days;

L.   A Court order preventing Defendants from harassing and seeking payment of rents from Plaintiffs until all nuisances, substandard conditions, and untenantable conditions at the Oroville Inn are abated or remedied;

M.   A Court order prohibiting Defendants from entering the Subject Premises without notice as required by Civil Code § 1954 and for reasons not permitted under Civil Code § 1954;

N.   A Court order prohibiting Defendants from unilaterally changing terms of tenancy without the informed consent of relevant Plaintiffs;

O.   A Court order prohibiting Defendants from threatening to serve and/or serving on Plaintiff letters or notices containing allegations that Defendants know, or should know, are false, that are designed to harass, or that are made without sufficient information to determine the truth or falsity of the allegations;

P.   A Court order prohibiting Defendants from stating to Plaintiffs that they are or may be in violation of the lease agreement when Defendants know or should know that these statements are false, designed to harass, or made without sufficient information to determine the truth or falsity of the statements; and

Q.   Such other and further legal and equitable relief as this Court may deem proper.

## SECOND CAUSE OF ACTION

**For Violation of Mail Fraud Act, 18 U.S.C § 1341, Wire Fraud Act, 18 U.S.C. § 1343, and Civil Forfeiture Act, 18 U.S.C. § 981**

**(Against All Defendants)**

371.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

372.   Defendant initiated and continued to engage in a business practice designed to defraud Plaintiffs out of rent monies for unsafe, untenantable, and unusable apartments.

373.   Defendants engaged in the business practice of contacting Plaintiffs repeatedly via mail and telephone for the purpose of removing him from his apartment.

374.    Defendants' use of the mail and telephone to make misrepresentations and false promises to Plaintiffs violates the Mail Fraud Act and Wire Fraud Act.  Defendants, having devised a scheme, obtained property from Plaintiffs by means of false and fraudulent pretenses.  Defendants made fraudulent pretenses by mail and over the telephone to Plaintiffs, namely, that Defendants would repair any unsafe or untenantable building conditions, that other building conditions were safe and habitable when they were not, and omitting material facts regarding the health risks of continuing to reside at the Oroville Inn.

375.    Defendants contacted Plaintiffs by means of mail and telephone wire between states for the purposes of defrauding Plaintiffs and in violation of the Mail Fraud Act and Wire Fraud Act.

376.    Plaintiffs relied on Defendants' intentional misrepresentations and began renting or continued to rent unsafe, untenantable and unusable apartments.

377.    Defendants engaged in the business practice of misrepresenting to Plaintiffs that building conditions were safe and that unsafe or unhealthy building conditions would be repaired in a timely manner.

378.    By omitting information regarding the health and safety hazards created by the conditions of the Oroville Inn, Defendants misrepresented to Plaintiffs the risks of inhabiting or continuing to inhabit apartments in the Oroville Inn.

379.    Defendants knew or reasonably should have known that the conditions of the Oroville Inn were unsafe, untenantable and/or unhealthy.

380.    Defendants had no intention of repairing unsafe, untenantable or unusable building conditions in a timely manner.

381.    Defendants made these representations while knowing that the representations were false or with reckless disregard of their falsity.

382.    By engaging in mail and wire fraud, Defendants are subject to Civil Forfeiture under 18 U.S.C. § 981, *et seq.*   Under this Act, an individual may move for a judicial proceeding requiring that a party who violated 18 U.S.C. § 1341 or § 1343 forfeit their rights to the property acquired through fraudulent means, to the United States Government.   As the Act states, property subject to forfeiture to the United States includes: "any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of…section 1341

(relating to mail fraud); or section 1343 (relating to wire fraud)…."

383.   Defendants' fraudulent misconduct and business practices, achieved through intentional misrepresentation via mail, telephone, and facsimile across state lines, violates the Mail Fraud Act and Wire Fraud Act.  As such, Defendants, as the Act intends, should not be able to profit from said wrongdoing.

384.   Plaintiffs relied on Defendants' intentional misrepresentations via telephone and facsimile, and after a pattern of wire fraud, harassment, and hostility, accepted Defendants' misrepresentations without the knowledge of Defendants' fraudulent intentions.

385.   As a direct and proximate result of these violations of federal law, Plaintiffs were and continue to be damaged in an amount according to proof, including, without limitation, statutory damages and actual damages, including Defendants' civil forfeiture of the property at issues, and payments of rent and other charges collected by Defendants.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  Actual and statutory damages to Plaintiffs for violations of the Wire Fraud Act and Civil Forfeiture Act;

E.  For appropriate injunctive and equitable relief;

F.  Punitive damages to Plaintiffs according to proof at trial;

G.  Attorneys fees and expenses of litigation to the extent provided by law;

H.  Costs of suit; and

I.  Such other and further legal and equitable relief as this Court may deem proper.

### THIRD CAUSE OF ACTION

#### For Fraud/Intentional Misrepresentation in Violation of

#### Cal. Civ. Code § 1565 and § 1572 *et seq.*

#### (Against All Defendants)

386.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

387.   Defendant initiated and continued to engage in a business practice designed to defraud Plaintiffs out of rent monies for unsafe, untenantable, and unusable apartments.

388.   Defendants engaged in the business practice of misrepresenting to Plaintiffs that building conditions were safe and that unsafe or unhealthy building conditions would be repaired in a timely manner.

389.   By omitting information regarding the health and safety hazards created by the conditions of the Oroville Inn, Defendants misrepresented to Plaintiffs the risks of inhabiting or continuing to inhabit apartments in the Oroville Inn.

390.   Defendants knew or reasonably should have known that the conditions of the Oroville Inn were unsafe, untenantable and/or unhealthy.

391.   Defendants had no intention of repairing unsafe, untenantable or unusable building conditions in a timely manner.

392.   Defendants made these representations while knowing that the representations were false or with reckless disregard of their falsity.

393.   Defendants, by and through their intentional misrepresentations to the tenants, sought to deceive the tenants into remaining at the Oroville Inn and continuing to pay rent for unsafe, unusable and untenantable apartments.

394.   Defendants intended to induce the tenants to rely on their misrepresentations and false promises, and Plaintiffs did in fact rely on these misrepresentations and false promises by remaining in their apartments and continuing to pay rent.

395.   Defendants intended to induce prospective tenants to rely on their misrepresentations and false promises, and Plaintiffs did in fact rely on these misrepresentations and false promises when they elected to move into the Oroville Inn.

396.   By Defendants' acts of fraud and intentional misrepresentation, plaintiffs are entitled to damages under Cal. Civ. Code § 1565 *et seq.*, and plaintiffs are entitled to reliance and restitution damages.  Plaintiffs, by remaining in their unsafe apartments, continued to pay rent over and above what the conditions of their apartments justified.  Plaintiffs also continued to expose themselves to unsafe and unhealthy living conditions, and some plaintiffs have developed illnesses and injuries as a result.

397.   Defendants acted with oppression and malice when making knowing misrepresentations and false promises to Plaintiffs.

398.   As a direct and proximate result of these violations of state law, Plaintiffs were and continue to be damaged in an amount according to proof, including, without limitation, statutory damages and actual damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  Actual and statutory damages to Plaintiffs for violations of California State law;

E.  For appropriate injunctive and equitable relief;

F.  Punitive damages to Plaintiffs according to proof at trial;

G.  Attorneys fees and expenses of litigation to the extent provided by law;

H.  Costs of suit; and

I.   Such other and further legal and equitable relief as this Court may deem proper.

///

///

## **FOURTH CAUSE OF ACTION**

**For Unlawful Fraudulent and Unfair Business Practices in Violation of**

**Cal. Bus. & Prof. Code § 17200 *et seq.***

**(Against All Defendants)**

399.    Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

400.    The California Unfair Competition Law, California Business and Profession Code § 17200 *et seq.* ("UCL"), defines unfair competition to include any "unlawful," "unfair," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code § 17200.

401.    Defendant's conduct as described above constitutes fraudulent business practices for the reasons set forth below, without limitation:

402.    Defendants' ongoing business practices are fraught with material misrepresentations and omissions that are likely to deceive tenants.  Defendants' past business practices were fraught with material misrepresentations and omissions that deceived tenants.

403.    In its dealings with Plaintiffs, Defendants misrepresented the nature, extent and duration of the repair activities it needed or intended to perform in the Oroville Inn in an effort to maintain its desired levels of occupancy at the building and to encourage new tenants to move into the building.

404.    In its dealings with Plaintiffs, Defendants failed to disclose (and thereby misrepresented) the nature, extent and duration of the health risks created by inhabiting the Oroville Inn in an effort to maintain its desired levels of occupancy at the building and to encourage new tenants to move into the building.

405.    In its dealings with Plaintiffs, Defendants failed to disclose (and thereby misrepresented) that its repair activities were not being undertaken in a safe, code-compliant manner, pursuant to appropriate permits.

406.    Defendants' material misrepresentations are likely to deceive tenants, likely to induce tenants to misunderstand the material contract terms, and/or likely to induce a tenant to begin renting or continue renting an apartment at the Oroville Inn.

407.    As a result of, and in reliance on, these unlawful and fraudulent business practices, Plaintiffs suffered injury in fact and lost money and property.

- 49 -

408.   Pursuant to California Business and Professions Code section 17203, Plaintiffs are entitled to enjoin the practice of retaliatory eviction and to obtain restitution of all funds obtained by Defendant by reason of and through the use of these unlawful, unfair, or fraudulent acts and practices.

409.   Pursuant to Code of Civil Procedure section 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  An injunction prohibiting retaliatory eviction;

D.  An injunction prohibiting Defendants from harassing or seeking payment of rent from Plaintiffs until all nuisances, substandard conditions, and untenantable conditions at the Oroville Inn are abated or remedied;

E.  For pre-judgment interest as allowed by law;

F.  Actual and statutory damages to Plaintiffs for violations of California State law;

G.  For appropriate injunctive and equitable relief;

H.  Attorneys fees and expenses of litigation to the extent provided by law;

I.   Costs of suit; and

J.   Such other and further legal and equitable relief as this Court may deem proper.

///

///

## FIFTH CAUSE OF ACTION

### For Breach of Contract in Violation of

### Cal. Civ. Code § 1565 and § 3300 *et seq.*

### (Against All Defendants)

410. Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

411. Plaintiffs each entered into leases with Defendants for the rental of apartments at the Oroville Inn. The law implies a Warranty of Habitability in every residential lease.

412. Defendants have breached the Implied Warranty of Habitability without justification.

413. Defendants initiated and continue to engage in a business practice designed to deprive Plaintiffs of the full, beneficial use and quiet enjoyment of Plaintiffs' rental units without a corresponding decrease in rent.

414. As part of Defendants' business practices, Defendants failed to abate nuisances which interfered with Plaintiffs' use of their rental units.

415. As part of Defendants' business practices, Defendants failed to repair faulty, unsafe and/or unhealthy building conditions and appurtenances which interfered with Plaintiffs' use of their rental units.

416. As part of Defendants' business practices, Defendants failed to decrease Plaintiffs' rent on account of unabated nuisances and faulty, unsafe, and/or unhealthy building conditions and appurtenances which interfered with Plaintiffs' use of their rental units.

417. Defendants evicted or attempted to evict several Plaintiffs without just cause. Defendants evicted Jerry Jones because he contacted OSHA and an attorney about the unsafe living conditions at the Oroville Inn. Defendants attempted to evict Ms. Webster because she has made many requests for repairs of the unsafe living conditions of her apartment.

418. Defendants, by and through their intentional misrepresentations to Plaintiffs sought to deprive Plaintiffs of the full, beneficial use and quiet enjoyment of their rental units while still collecting full rent.

419. Defendants intended to induce Plaintiffs' reliance on their misrepresentations, and Plaintiffs did in fact rely on their misrepresentation by deciding to rent or to continue to rent apartments at the Oroville Inn.

420. Plaintiffs were harmed because the Defendants demanded and collected full rental payments from Plaintiffs despite the fact that the Implied Warranty of Habitability had been breached and Plaintiffs were not obligated to pay full rental payments. Plaintiffs were harmed because they were exposed to increased risks of illness and injury created by the Defendants' breach of the Implied Warranty of Habitability. Some Plaintiffs suffered injuries and illness due to the Defendants' breach of the Implied Warranty of Habitability. Plaintiffs have suffered emotional distress caused by the Defendants' breach of the Implied Warranty of Habitability.

421. The Defendants knew of the disabilities and other special conditions of several Plaintiffs and knew that their breach of the Implied Warranty of Habitability would cause special damages to these Plaintiffs.

422. By Defendants' acts of fraud and intentional misrepresentation, Plaintiffs are entitled to damages under Cal. Civ. Code § 1565 *et seq.*, Cal. Civ. Code § 3300 *et seq.*, and Plaintiffs are entitled to reliance and restitution damages. Plaintiffs acted in reliance on Defendants' false representations. California Civil Code § 3300 states that for breach of a contract, damages are measured by the "amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

423. As a direct and proximate result of these violations of state law, Plaintiffs were and continue to be damaged in an amount according to proof, including, without limitation, statutory damages and actual damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A. For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B. For compensatory damages to Plaintiffs;

C. For pre-judgment interest as allowed by law;

D. Actual and statutory damages to Plaintiffs for violations of California State law;

E. For appropriate injunctive and equitable relief;

F. Special damages to Plaintiffs according to proof at trial;

G. Attorneys fees and expenses of litigation to the extent provided by law and the terms of the

1    contract;

2    H.  Costs of suit; and

3    I.   Such other and further legal and equitable relief as this Court may deem proper.

4    ## SIXTH CAUSE OF ACTION

5    ### For Breach of the Covenant of Quiet Enjoyment

6    ### (Against All Defendants)

7    424.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

8    425.   Defendants and Plaintiffs intended that Plaintiffs should not be disturbed in their possession
        and use of their rental units at the Oroville Inn.

9    426.   Defendants acted so as to interfere with Plaintiffs' rights to use and enjoy the property for the
        purposes contemplated by the tenancy.  Plaintiffs could not rest or seek refuge in their apartments;
        Plaintiffs could not use all of the property or all of its appurtenances as they were in disrepair or an
        untenantable condition.

13   427.   Several Plaintiffs were actually or constructively evicted from the premises on account of
        Defendants' breach of the Covenant of Quiet Enjoyment.

15   428.   As a direct and proximate result of these violations of state law, Plaintiffs were and continue to
        be damaged in an amount according to proof, including, without limitation, statutory damages and
        actual damages.

18   **WHEREFORE**, Plaintiffs pray for judgment as follows:

19   A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from
        Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

21   B.  For compensatory damages to Plaintiffs;

22   C.  For pre-judgment interest as allowed by law;

23   D.  Actual and statutory damages to Plaintiffs for violations of California State law;

24   E.  For appropriate injunctive and equitable relief;

25   F.  Special damages to Plaintiffs according to proof at trial;

26   G.  Attorneys fees and expenses of litigation to the extent provided by law;

27   H.  Costs of suit; and

28   I.   Such other and further legal and equitable relief as this Court may deem proper.

*Jones, et al. v. Benefield, et al. – Complaint for Damages, Injunctive Relief, Declaratory Relief, Constructive Trust*

**SEVENTH CAUSE OF ACTION**

**For Breach of the Implied Warranty of Habitability in Violation of**

**Cal. Civ. Code § 1941 *et seq.***

**(Against All Defendants)**

429.    Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

430.    Defendants initiated and continue to engage in a business practice designed to deprive Plaintiffs of bare living requirements while still demanding full payment of rent.

431.    Defendants initiated and continue to engage in a business practice whereby Defendants subjected Plaintiffs to months and years of untenantable conditions, including a substantial lack of weather protection by the roof and exterior windows, plumbing facilities that are substantially not maintained in good working order, electrical lighting, wiring and equipment substantially not maintained in good working order, heating facilities that are substantially not maintained in good working order, and building grounds that are not clean, sanitary or free from accumulation of debris, filth, rubbish, garbage, rodents and vermin.

432.    Plaintiffs continuously and repeatedly notified Defendants of the habitability defects of their rental units and common areas in the Oroville Inn.  Many other habitability defects were obvious and in plain view and Defendants knew or should have known those defects existed.  Defendants repeatedly failed to repair habitability defects at all or in a reasonable amount of time.

433.    Such conditions constitute substantial violations of California Civil Code § 1941.1, California Health and Safety Code § 17920.3.

434.    As a direct and proximate result of these violations of state and local law, Plaintiffs were and continue to be damaged in an amount according to proof, including, without limitation, statutory damages and actual damages.  Plaintiffs have suffered emotional distress from the habitability defects.  In addition, Plaintiffs are entitled to reasonable attorney's fees and costs pursuant to order of the court for have to file such a suit.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

1    C.  For pre-judgment interest as allowed by law;

2    D.  Actual and statutory damages to Plaintiffs for violations of California State law;

3    E.  For appropriate injunctive and equitable relief;

4    F.  Attorneys fees and expenses of litigation to the extent provided by law;

5    G.  Costs of suit; and

6    H.  Such other and further legal and equitable relief as this Court may deem proper.

## EIGHTH CAUSE OF ACTION

### For Breach of the Covenant of

### Good Faith and Fair Dealing

### (Against All Defendants)

435.    Plaintiff re-alleges each and every allegation above as if fully set forth in this Claim.

436.    The wrongful conduct of Defendant, as alleged herein, constituted a fraud against all Plaintiffs. Defendants, directly or through their agents and employees, assumed control or ownership over Plaintiffs' property interest and Defendants applied the property to their own use.

437.    Plaintiff had a valid written lease agreement.  That agreement, like all contracts in the State of California, contains an implied covenant of good faith and fair dealing.  That covenant requires, broadly, that neither party do anything that will deprive the other of the benefits of their agreement.

438.    Plaintiffs performed all or substantially all things required of Plaintiff under the lease agreement.  Defendants were not excused from having to abide by its obligations under the lease agreement. All the conditions required for Defendants' performance had occurred.

439.    Defendants breached the covenant of good faith and fair dealing and attempted to injure Plaintiff's rights to receive the benefits of the agreement by their actions outlined above.

440.    Defendants continued to receive the benefits of the agreement.

441.    Defendants unfairly interfered with Plaintiffs' right to receive the benefits of their contracts by their wrongful failures to abate nuisances, repair habitability defects, and keep the Oroville Inn in a safe, sanitary and habitable condition.   These actions and omissions by Defendants were objectively unreasonable.

442.    The above-named Defendants breached the covenant of good faith and fair dealing by

depriving Plaintiffs of the full use and enjoyment of their rental property, as detailed above.

443.    Defendants' intent was to deprive Plaintiffs of the beneficial use and enjoyment of their homes, break the valid lease agreement already in effect, and illegally attempt to recover possession of Plaintiffs' rental units at 2066 Bird Street, Oroville, California.

444.    As a direct and proximate result of Defendants' wrongful acts and/or omissions alleged herein, Plaintiffs have suffered discomfort, inconvenience, annoyance, humiliation, fear, anxiety, and emotional distress, all to their general detriment.

445.    In taking the wrongful actions alleged herein, each Defendant acted with an awareness of primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  For general damages according to proof;

E.  For appropriate injunctive and equitable relief;

F.  Attorneys fees and expenses of litigation to the extent provided by law;

G.  Costs of suit; and

H.  Such other and further legal and equitable relief as this Court may deem proper.

///

///

## NINTH CAUSE OF ACTION

### For Public and Private Nuisance in Violation of

### Cal. Civ. Code § 3479 *et seq.*

### (Against All Defendants)

446.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

447.   Plaintiffs leased or occupied residential rental units at the Oroville Inn.

448.   Defendants, by failing to repair unsafe, unhealthy, unsanitary and untenantable conditions of the Oroville Inn and its grounds, created conditions that were harmful to the health of Plaintiffs, indecent or offensive to the senses of Plaintiffs, and obstructed the free use of Plaintiffs' property so as to substantially and unreasonably interfere with the comfortable enjoyment of life or property.

449.   Defendants' failure to repair unsafe, unhealthy, unsanitary and untenantable conditions substantially and unreasonably interfered with collective social interests.

450.   Defendants' failure to repair unsafe, unhealthy, unsanitary and untenantable conditions affected a substantial number of people at the same time, namely Plaintiffs, Plaintiffs' guests, and anyone who wandered in or near the Oroville Inn.

451.   An ordinary person would be reasonably annoyed or disturbed by the unsafe, unhealthy, unsanitary and untenantable conditions of the Oroville Inn.

452.   The unsafe, unhealthy, unsanitary and untenantable conditions of the Oroville Inn created actual harm and serious risk of harm.

453.   The unsafe, unhealthy, unsanitary and untenantable conditions of the Oroville Inn created no social utility, and the Defendants' failure to repair these conditions created no social utility.

454.   Plaintiffs did not consent to Defendants' failure to repair the unsafe, unhealthy, unsanitary and untenantable conditions of the Oroville Inn.

455.   Plaintiffs suffered harm that was different than the harm suffered by the general public, as Plaintiffs were forced to live in these conditions for prolonged periods of time.  Additionally, Plaintiffs suffered harm to their use of their rental property which members of the general public did not sustain.  Plaintiffs were substantially unable to use their rental units in

456.   Plaintiffs were harmed by the unsafe, unhealthy, unsanitary and untenantable conditions of the

Oroville Inn.  These conditions were harmful to health, were indecent or offensive to the senses, and obstructed the free use of Plaintiffs' property so as to interfere with their comfortable enjoyment of life or property.

457.  Defendants' conduct in failing to repair the unsafe, unhealthy, unsanitary and untenantable conditions of the Oroville Inn was a substantial factor in causing Plaintiffs' harm.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  Actual and statutory damages to Plaintiffs for violations of California State law;

E.  For appropriate injunctive and equitable relief;

F.  Punitive damages to Plaintiffs according to proof at trial;

G.  Attorneys fees and expenses of litigation to the extent provided by law;

H.  Costs of suit; and

I.  Such other and further legal and equitable relief as this Court may deem proper.

## TENTH CAUSE OF ACTION

### For Retaliatory Eviction in Violation of

### Cal. Civ. Code § 1942.5

### (Against All Defendants)

458.  Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

459.  The wrongful conduct of all Defendants, as alleged herein, constituted a fraud against Plaintiffs.  Defendants, directly or through their agents and employees, assumed control or ownership over Plaintiffs' property interest and Defendants applied the property to their own use.

460.  Plaintiffs were not in default as to the payment of their rent.

461.  Plaintiffs, in good faith, made oral or written complaints to the Defendant and/or written complaints to an agency regarding tenantability.  Within 180 days of these events or an inspection resulting from these events, Defendants took action to recover possession of Plaintiffs' rental units by, among other things, unlawfully increasing rent, withholding mail, intentionally failing to

- 58 -

acknowledge repair requests and intentionally failing to abate nuisances, for the purpose of retaliation against Plaintiffs because Plaintiffs lawfully exercised their rights as tenants.

462.     Defendants increased the rent, withheld mail, failed to acknowledge repair requests, and failed to abate nuisances in bad faith and without justification.

463.     Defendants' actions constitute fraud and oppression, and Defendants acted with malice in retaliating against Plaintiffs.

464.     In taking the wrongful actions alleged herein, each Defendant acted with an awareness of primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

465.     In taking the actions alleged herein, Defendants and each of them acted with malice, fraud and oppression, in a manner that violated Cal. Civ. Code §3294 and 3288, under which Plaintiffs are entitled to damages.

466.     As a result of Defendants' wrongful conduct, Plaintiffs have suffered and continue to suffer economic losses and other general and specific damages, including moving costs.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  Actual and statutory damages to Plaintiffs for violations of California State law

E.  For appropriate injunctive and equitable relief;

F.  Punitive damages to Plaintiffs according to proof at trial;

G.  Attorneys fees and expenses of litigation to the extent provided by law;

H.  Costs of suit; and

I.  Such other and further legal and equitable relief as this Court may deem proper.

///

///

## ELEVENTH CAUSE OF ACTION

### For Constructive Eviction

### (Against All Defendants)

467. Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

468. Plaintiffs had leased apartments in the Oroville Inn, and thus they had a lawful right to inhabit the Oroville Inn.

469. Defendants' breach of the warranty of habitability rendered a substantial portion of the Oroville Inn unfit for the purpose for which it was leased. Plaintiffs were unable to use many of the appurtenances of their apartments, and Plaintiffs were exposed to severe health risks by simply residing in the Oroville Inn.

470. Defendants' failure to abate nuisances created disturbances and interfered with Plaintiff's possession of the premises.

471. Defendants' failure to maintain the safety, cleanliness, and functionality of the premises of the Oroville Inn deprived Plaintiffs of the beneficial use and enjoyment of the premises.

472. Plaintiffs were forced to vacate the premises due to the acts and omissions of the Defendants.

473. As a result of Defendants' constructive eviction, Plaintiffs have suffered and continue to suffer damages in an amount according to proof, including, without limitation, restitution and compensatory damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A. For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B. For compensatory damages to Plaintiffs;

C. For pre-judgment interest as allowed by law;

D. Actual and statutory damages to Plaintiffs for violations of California State law;

E. For appropriate injunctive and equitable relief;

F. Punitive damages to Plaintiffs according to proof at trial;

G. Attorneys fees and expenses of litigation to the extent provided by law;

H. Costs of suit; and

I. Such other and further legal and equitable relief as this Court may deem proper

**TWELFTH CAUSE OF ACTION**

**For Wrongful Eviction**

**(Against All Defendants)**

474.  Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

475.  Plaintiffs had leased apartments in the Oroville Inn, and thus they had a lawful right to inhabit the Oroville Inn.

476.  Defendants' breach of the warranty of habitability rendered a substantial portion of the Oroville Inn unfit for the purpose for which it was leased.  Plaintiffs were unable to use many of the appurtenances of their apartments, and Plaintiffs were exposed to severe health risks by simply residing in the Oroville Inn.

477.  Defendants' failure to abate nuisances created disturbances and interfered with Plaintiff's possession of the premises.

478.  Defendants' failure to maintain the safety, cleanliness, and functionality of the premises of the Oroville Inn deprived Plaintiffs of the beneficial use and enjoyment of the premises.

479.  Plaintiffs were forced to vacate the premises due to the acts and omissions of the Defendants.

480.  As a result of Defendants' wrongful eviction, Plaintiffs have suffered and continue to suffer damages in an amount according to proof, including, without limitation, restitution and compensatory damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  Actual and statutory damages to Plaintiffs for violations of California State law;

E.  For appropriate injunctive and equitable relief;

F.  Punitive damages to Plaintiffs according to proof at trial;

G.  Attorneys fees and expenses of litigation to the extent provided by law;

H.  Costs of suit; and

I.  Such other and further legal and equitable relief as this Court may deem proper

**THIRTEENTH CAUSE OF ACTION**

**For Failure to Pay Wages in Violation of**

**Cal. Lab. Code §§ 202 and 203**

**(Against All Defendants)**

481.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

482.   Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, Donald Durbin, and David Hardy were all employed by Defendants.

483.   Defendants did not pay Plaintiffs their earned and unpaid wages, without abatement or reduction, within 72 hours of the time Plaintiffs quit or were discharged.  Defendants did not pay these earned and unpaid wages within 30 days of the date Plaintiffs quit or were discharged.

484.   Defendants failed to pay Jerry Jones his wages as means of retaliation against Mr. Jones for reporting health and building code violations to OSHA and an attorney.

485.   Plaintiffs did not absent themselves in order to avoid payment. Plaintiffs did not refuse to receive payment fully tendered.

486.   California Labor Code § 203 requires that all employers who fail to pay their employees within 72 hours of the time Plaintiffs quit or discharged pay a penalty equal to the employee's wages for a period of up to 30 days.  As Defendants failed to pay Plaintiffs their earned and unpaid wages within 30 days of the date of Plaintiffs' discharge, Defendants are obligated to pay Plaintiffs 30 days of wages in addition to any unpaid and earned wages.

487.   California Labor Code §§ 218.5 and 218.6, respectively, provide Plaintiffs with recovery for attorneys fees and costs incurred in recovering unpaid wages and interest on the unpaid wages.

488.   As a result of Defendants' failure to pay earned but unpaid wages, Plaintiffs have suffered and continue to suffer damages in an amount according to proof, including, without limitation, restitution and punitive damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of earned and unpaid wages, including interest;

B.  For punitive damages equal to 30 days of wages, including interest;

C.  Attorneys fees and expenses of litigation to the extent provided by law;

D.  Costs of suit; and

E.  Such other and further legal and equitable relief as this Court may deem proper.

## FOURTEENTH CAUSE OF ACTION

### For Failure to Pay Minimum Wages and Overtime Pay in

### Violation of Cal. Lab. Code §§ 1197 and 1198

### (Against All Defendants)

489.    Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

490.    Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, Donald Durbin and were employed by Defendants.

491.    Defendants did not pay Plaintiffs the minimum wage.

492.    Plaintiffs were authorized and often directed to work overtime.

493.    Defendants did not pay Plaintiffs earned overtime pay.

494.    Defendants unlawfully credited lodging costs towards Plaintiffs' minimum wage.

495.    That Plaintiffs consented to receive wages below minimum wage and/or established overtime compensation is no bar to Plaintiffs recovering the balance of the full amount of the minimum wage and/or overtime compensation.

496.    Defendants did not fail to pay minimum wage to Plaintiffs through good faith error or oversight.  Defendants did not fail to pay overtime compensation to Plaintiffs through good faith error or oversight.

497.    Defendants willfully failed to pay minimum wages and earned overtime compensation to Plaintiffs.

498.    The lodging provided by Defendants to Plaintiffs was not adequate, decent or sanitary according to the usual customs of the industry.

499.    Defendants failed to pay Jerry Jones his wages as means of retaliation against Mr. Jones for reporting health and building code violations to OSHA and an attorney.  Defendants acted with malice in failing to pay Mr. Jones the minimum wage and earned overtime compensation.

500.    As a result of Defendants' failure to pay minimum wage and overtime compensation, Plaintiffs have suffered and continue to suffer damages in an amount according to proof, including, without limitation, liquidated and restitution damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon;

B.  For restitution damages in an amount equal to the earned and unpaid overtime work performed by Plaintiffs;

C.  For appropriate injunctive and equitable relief;

D.  Punitive damages to Plaintiffs according to proof at trial;

E.  Attorneys fees and expenses of litigation to the extent provided by law;

F.  Costs of suit; and

G.  Such other and further legal and equitable relief as this Court may deem proper.

### FIFTEENTH CAUSE OF ACTION

### For Wrongful Termination in Violation of Public Policy

### (Against All Defendants)

501.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

502.   Plaintiffs Jerry Jones and David Hardy were employed by Defendants.  Plaintiffs Jones and Hardy were not independent contractors.

503.   Plaintiff Jerry Jones was terminated shortly after Defendants learned that Plaintiff Jerry Jones sought the advice of counsel in regards to the conditions of the Oroville Inn and that Plaintiff Jerry Jones reported the conditions of the Oroville Inn to OSHA.

504.   Defendants created false claims that Plaintiff Jerry Jones embezzled money from Defendants immediately after learning that Plaintiff Jerry Jones had consulted OSHA and an attorney. Defendants relied on these false claims as justification for termination of Plaintiff Jerry Jones.

505.   Plaintiff Jerry Jones was terminated by Defendants in violation of fundamental public policy.

506.   Plaintiff Jerry Jones was terminated by Defendants for seeking representation by an attorney and for reporting the unsafe, untenantable, and unsanitary conditions of the Oroville Inn to OSHA.

507.   Plaintiff Hardy was terminated the day after Defendants, through their agent, Jerry Jones, learned that Mr. Hardy agreed to speak with the City Attorney and City inspector about the conditions at the Oroville Inn.

508.   Plaintiff Hardy was terminated in violation of fundamental public policy.  Public Policy provides that employers should not force employees to hide employer violations of the law through

threat of termination or other negative employment action. Public policy provides that employees should be able to cooperate in an investigation into wrongdoing by the employer without fear of retaliation by their employer.

509. These public policies inure to the benefit of the public, rather than the individual. These public policies are fundamental and substantial. Without these public policy protections for whistleblowers, whistleblowers would not have adequate incentive to come forward.

510. Plaintiff Jerry Jones would not have been terminated had he not consulted an attorney or OSHA about the conditions of the Oroville Inn. Plaintiff Jerry Jones's protected activity in consulting these entities was the proximate cause of his termination.

511. Plaintiff Hardy would not have been terminated had he not agreed to speak with the City Attorney and City Inspector regarding the conditions of the Oroville Inn.

512. As a result of his termination, Plaintiffs Jones and Hardy have suffered and continue to suffer damages in an amount according to proof, including, without limitation, compensatory damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A. For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B. For compensatory damages to Plaintiffs;

C. For pre-judgment interest as allowed by law;

D. Actual and statutory damages to Plaintiffs for violations of California State law;

E. For appropriate injunctive and equitable relief;

F. Punitive damages to Plaintiffs according to proof at trial;

G. Attorneys fees and expenses of litigation to the extent provided by law;

H. Costs of suit; and

I. Such other and further legal and equitable relief as this Court may deem proper

### SIXTEENTH CAUSE OF ACTION

### For Defamation in Violation of Cal. Civ. Code § 44

### (Against Defendants Jonothan and Julie Benefield)

513. Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

514. Plaintiff Jerry Jones had a good name and reputation among his neighbors, colleagues, and

acquaintances.

515.    Defendants Jonothan and Julie Benefield slandered and libeled Plaintiff Jerry Jones.

516.    The Benefields falsely accused Plaintiff Jones of committing a crime, namely embezzlement or thievery of rent payments from tenants of the Oroville Inn.   These words were spoken of and concerning Plaintiff Jones.

517.    The Benefields published these false accusations to more than one person other than Plaintiff Jones by both oral utterance and by writing.   The Benefields posted these accusations in the comments section of an internet newspaper article, post and on a notice in the Oroville Inn, and they orally repeated these accusations to Rick Robertson, Sergeant Lagrone, Nita Webster, and other individuals.

518.    The Benefields were not privileged to make these false accusation.

519.    The Benefields intentionally, and with evil motive and malice, published these defamatory statements about Plaintiff Jones.

520.    The Benefields knew that these statements about Plaintiff Jones were false, and the Benefields intended to defame Plaintiff Jones by the publication of these defamatory statements.

521.    At the very least, the Benefields were negligent in failing to ascertain the falsity of their accusations that Plaintiff Jones embezzled money or was a thief.

522.    Plaintiff Jones has suffered damages to his good name as a result of the Benefields' defamation.   The Benefields' defamation has exposed Plaintiff Jones to hatred, contempt, ridicule, and obloquy.   Plaintiff Jones has suffered hurt feelings, distress, mental suffering, grief and humiliation as a result of the Benefields' defamation.

**WHEREFORE**, Plaintiff Jones pray for judgment as follows:

A.  For compensatory damages to Plaintiff;

B.  Actual and statutory damages to Plaintiff for violations of California State law;

C.  For appropriate injunctive and equitable relief;

D.  Punitive damages to Plaintiff according to proof at trial;

E.  Attorneys fees and expenses of litigation to the extent provided by law;

F.  Costs of suit; and

G.  Such other and further legal and equitable relief as this Court may deem proper

### SEVENTEENTH CAUSE OF ACTION

#### For Intentional Infliction of Emotional Distress

#### (Against All Defendants)

523.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

524.   Defendants' conduct in failing to maintain the Oroville Inn in a safe, usable, and habitable condition was outrageous.  Among other things, exposing tenants to mold and other health risks for months and years without repair or abatement goes beyond all possible bounds of decency.

525.   Defendants abused a position of authority in that Defendants refused to repair unsafe, unusable and untenantable conditions of the Oroville Inn in a reasonable amount of time.

526.   Defendants knew that disabled Plaintiffs were particular vulnerable to emotional distress on account of their disabilities.

527.   Defendants knew that their conduct would likely result in harm due to mental distress.

528.   Defendants intended to cause Plaintiffs emotional distress.

529.   At the very least, Defendants acted with disregard of the probability that Defendants would suffer emotional distress from Defendants' outrageous conduct.  Defendants knew that Plaintiffs would probably suffer emotional distress from Defendants' failure to maintain the Oroville Inn in a safe, usable and habitable condition, yet Defendants gave little or no thought to the probable effects of their conduct.

530.   Plaintiffs suffered severe emotional distress as a result of Defendants' failure to maintain the Oroville Inn in a safe, usable and habitable condition.  Plaintiffs suffer worry and anxiety that their exposure to unsafe and unsanitary conditions at the Oroville Inn has increased their risk of illness or has caused illness.  Plaintiffs suffer worry and anxiety that the Oroville Inn may collapse in an earthquake or quickly combust in a fire.  Plaintiffs suffered humiliation and shame regarding the unsafe, unusable, untenantable and unsanitary conditions of the place they call home.

531.   Plaintiffs have suffered from emotional distress resulting from Defendants' failure to maintain the Oroville Inn in a safe, usable and habitable condition for months and years because the Defendants have failed to maintain the Inn in such a condition for years and years.

532.   Defendants knew that Plaintiffs were present when their outrageous conduct occurred as Plaintiffs resided in the Oroville Inn.

533.    As a result of Defendants' outrageous conduct, Plaintiffs have suffered and continue to suffer damages in an amount according to proof, including, without limitation, compensatory damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For compensatory damages to Plaintiffs;

B.  For emotional distress damages;

C.  For pre-judgment interest as allowed by law;

D.  For appropriate injunctive and equitable relief;

E.  Punitive damages to Plaintiffs according to proof at trial;

F.  Attorneys fees and expenses of litigation to the extent provided by law;

G.  Costs of suit; and

H.  Such other and further legal and equitable relief as this Court may deem proper

## EIGHTEENTH CAUSE OF ACTION

### For Violation of Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

### (Against All Defendants)

534.    Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

535.    Defendant Walnut Hill Estate Enterprises LLC ("WHE Enterprises") is an employer within the meaning of the Fair Labor Standards Act ("FLSA"). Defendant WHE Enterprises is an enterprise engaged in interstate business because it owns and operates a large apartment complex.

536.    Defendant Jonothan Benefield was also an employer within the meaning of the FLSA because he had ultimate control over the day-to-day operations of WHE Enterprises, he was the officer who was principally in charge of directing employment practices (such as hiring and firing employees), and he set employees' wages and schedules.

537.    Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, and Donald Durbin were all employees of Defendants WHE Enterprises and Jonothan Benefield.

538.    Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, and Donald Durbin, when employed by Defendants, were engaged in production of goods for commerce and their labor was concerned with process or occupation necessary to production of goods for commerce.

539.    Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, and Donald Durbin have received wages in an amount below the minimum wage of $7.25 established by 29 U.S.C. 206(a)(1). The regular rate

of pay for each Plaintiff was well below the minimum wage.

540.     Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, and Donald Durbin have not received their earned overtime compensation in accordance with the standards established by 29 U.S.C. 207(a)(1).   In fact, Defendants have never paid earned overtime compensation to any of the Plaintiffs.

541.     Although Defendants provided Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, and Donald Durbin with lodging pursuant to their employment, the cost credited to Plaintiffs was in excess of both the actual costs of providing lodging and the fair rental value of the units provided.

542.     The lodging provided by Defendants to Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, and Donald Durbin was primarily provided for the benefit of the Defendant employers, not the Plaintiff employees.

543.     Defendants did not compensate Plaintiff Jerry Jones for activity which was compensable by both an express provision of written and oral contracts between Plaintiff Jerry Jones and Defendants in effect at the time of the activity and custom and practice in effect at the time of such activity at the Oroville Inn.

544.     Defendants did not compensate Plaintiffs Joseph and Nick Adams for activity which was compensable by both an express provision of a contract between Plaintiffs Joseph and Nick Adams and Defendants in effect at the time of the activity, and custom and practice in effect at the time of such activity at the Oroville Inn.

545.     Defendants did not compensate Plaintiff Donald Durbin for activity which was compensable by both an express provision of an oral contract between Plaintiff Donald Durbin and Defendants in effect at the time of the activity, and custom and practice in effect at the time of such activity at the Oroville Inn.

546.     As a result of Defendants' violation of the Fair Labor Standards Act, Plaintiffs Jerry Jones, Joseph Adams, Nick Adams, and Donald Durbin have suffered and continue to suffer damages in an amount according to proof, including, without limitation, compensatory and punitive damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  Actual and statutory damages to Plaintiffs for violations of California State law;

E.  For appropriate injunctive and equitable relief;

F.  Punitive damages to Plaintiffs according to proof at trial;

G.  Attorneys fees and expenses of litigation to the extent provided by law;

H.  Costs of suit; and

I.  Such other and further legal and equitable relief as this Court may deem proper

## NINETEENTH CAUSE OF ACTION

### For Discrimination on the basis of Disability in Violation of

### The Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*

### (Against All Defendants)

547.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

548.   Defendants actively sought and retained disabled persons as tenants at the Oroville Inn as part of their common plan and scheme to defraud and commit unfair business practices.

549.   Plaintiffs Melissa Catron, Richard De La Vega, Horace Durbin, Teresa Durbin, Monique Karki, and Nita Webster are either physically, mentally, or emotionally disabled.

550.   Defendants sought disabled tenants because Defendants believed that disabled tenants would be easier to exploit and defraud.

551.   Disabled persons are entitled to full and equal accommodations to those afforded to non-disabled persons.

552.   Defendants repeatedly and consistently treated the disabled tenants in the Inn worse than the non-disabled tenants.  Defendants discriminated against their disabled tenants and denied them equal and full accommodations

553.   Defendants denied disabled tenants the opportunity to benefit from the accommodations at the Oroville Inn.

554.   Defendants failed to make alterations in such a manner that, to the maximum extent feasible, the Oroville Inn is and was readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs

555.    Defendants threatened to evict Plaintiff Monique Karki because her disability requires the use of a service dog.    Defendants failed to make reasonable accommodations for Plaintiff and discriminated against her based on her disability.

556.    Defendants refused to remove architectural barriers where removal was readily achievable.

557.    Defendants, through their negligence, fraud, and breach of the implied warranty of habitability, denied disabled persons full and equal accommodations.

558.    Plaintiffs, who are disabled tenants of the Oroville Inn, have suffered actual damages from Defendants' discrimination and denial of accommodation.    As a result, Plaintiffs are entitled to treble damages as provided by California Civil Code § 52(a).

559.    As a result of Defendants' discrimination and exploitation of persons based upon their disabilities, Plaintiffs have suffered and continue to suffer damages in an amount according to proof, including, without limitation, compensatory damages, permanent injunction and restraining order.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For restitution of all monies due to Plaintiffs or wrongfully taken by Defendants from Plaintiffs, and disgorged profits from the unlawful business practices of Defendants;

B.  For compensatory damages to Plaintiffs;

C.  For pre-judgment interest as allowed by law;

D.  Actual and statutory damages to Plaintiffs for violations of California State law;

E.  For appropriate injunctive and equitable relief;

F.  Punitive damages to Plaintiffs according to proof at trial;

G.  Attorneys fees and expenses of litigation to the extent provided by law;

H.  Costs of suit; and

I.  Such other and further legal and equitable relief as this Court may deem proper.

//

//

## TWENTIETH CAUSE OF ACTION

### For Negligence

### (Against All Defendants)

560.   Plaintiffs re-allege each and every allegation above as if fully set forth in this Claim.

561.   Defendants had a legal duty to Plaintiffs to use due care in maintaining the habitable condition of the Oroville Inn.  Defendants were under this legal duty because of the foreseeability of harm to tenants and guests and the policy of preventing future harm.

562.   Defendants breached this legal duty by failing to repair unsafe, unusable and untenantable conditions at the Oroville Inn.

563.   Defendants should have reasonably foreseen that their negligent failure to maintain the habitability of the Oroville Inn could result in damage or injury to Plaintiffs.

564.   Defendants' failure to maintain the Oroville Inn in a habitable condition injured Plaintiffs. Defendants' breach of its duty to keep the Oroville Inn in a habitable condition substantially contributed to bringing about illness and injury in Plaintiffs.

565.   Defendants' negligence has also caused Plaintiffs to suffer emotional distress, namely fear and anxiety of suffering physical injury as a result of Defendants' negligence.

566.   Plaintiffs suffered actual loss or damage as a proximate result of Defendants' negligence.

567.   As a result of Defendants' negligence, Plaintiffs have suffered and continue to suffer damages in an amount according to proof, including, without limitation, compensatory damages.

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.  For compensatory damages to Plaintiffs;

B.  For pre-judgment interest as allowed by law;

C.  For emotional distress;

D.  For appropriate injunctive and equitable relief;

E.  Punitive damages to Plaintiffs according to proof at trial;

F.  Attorneys fees and expenses of litigation to the extent provided by law;

G.  Costs of suit; and

H.  Such other and further legal and equitable relief as this Court may deem proper.

1                             **<u>DEMAND FOR JURY TRIAL</u>**

2 Plaintiffs hereby demand a trial by jury of each and every cause of action so triable.

3

4                                               Respectfully submitted,

    DATED: March 22, 2010

5                                             BRADSHAW & ASSOCIATES

6                                             A Professional Corporation

7                                           By: _____

8                                               Drexel A. Bradshaw

                                              Bradshaw & Associates, P.C.

9                                               Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Jones, et al. v. Benefield, et al. – Complaint for Damages, Injunctive Relief, Declaratory Relief, Constructive Trust*